WENDY J. OLSON, IDAHO STATE BAR NO. 7634
UNITED STATES ATTORNEY
AARON N. LUCOFF, IDAHO STATE BAR NO. 5707
HEATHER S. PATRICCO, DISTRICT OF COLUMBIA STATE BAR NO. 465883
ASSISTANTS UNITED STATES ATTORNEY
LAWRENCE SCHNEIDER, NEW YORK STATE BAR NO. 2594174
UNITED STATES DEPARTMENT OF JUSTICE TRIAL ATTORNEY
WASHINGTON GROUP PLAZA IV
800 EAST PARK BOULEVARD, SUITE 600
BOISE, ID 83712-7788
TELEPHONE: (208) 334-1211
FACSIMILE:  (208) 334-1413

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>vs.<br><br>FAZLIDDIN  KURBANOV,<br><br>   Defendant. | Case No. 1:13-cr-00120-EJL<br><br>**GOVERNMENT'S TRIAL<br>MEMORANDUM** |

The United States of America, by and through Wendy J. Olson, United States Attorney,

and the undersigned counsel, submits this trial memorandum.

## CASE STATUS

The defendant is charged by superseding indictment with five counts:  conspiracy and

attempt to provide material support to a designated foreign terrorist organization (FTO) the

GOVERNMENT'S TRIAL MEMORANDUM - 1

Islamic Movement of Uzbekistan (IMU),[1] conspiracy and attempt to provide material support in the preparation of and carrying out the use of weapons of mass destruction, and possession of an unregistered firearm.  He is also charged by indictment in the District of Utah with distribution of information relating to explosives, destructive devices and weapons of mass destruction.  Trial in this case will begin July 13, 2015.  The parties expect the trial to last four to six weeks.

STATEMENT OF FACTS

The defendant is an Uzbekistan national, who, on or about August 25, 2009, entered the United States through the United Nations' refugee program.  Around April 2012, he and his family moved to an apartment in Boise, Idaho, where they lived when this investigation began.

During the summer months of 2012, the defendant acquired from online and local stores various chemicals and components that can be used to construct a bomb.  He also uploaded several IMU propaganda videos to his YouTube account.  In July 2012, on his Facebook page, the defendant posted his photograph as his profile picture.  He posted the following title above the photo:  UZBEKISTAN, TASHKENT TERORISM [sic] TERROR UIH KARIMOV AFGANISTAN [sic] PAKISTAN.[2]

On July 31 and August 3, 2012, the defendant emailed abbos1433@mail.ru, an administrator of furqon.com, the official website of the IMU.[3]  In the July email, the defendant wrote that he had been watching martyrdom videos on the IMU's website and asked:

---

[1]     On September 9, 2000, the United States Secretary of State designated the "Islamic Movement of Uzbekistan (IMU)" as a foreign terrorist organization.  The IMU's designation as a foreign terrorist organization has remained continuously in effect since that time.

[2]     "Tashkent" is Uzbekistan's capital.  "UIH" is the Uzbek abbreviation of "IMU" or "Islamic Movement of Uzbekistan."  "Karimov" is "Islam Karimov," the President of Uzbekistan.

[3]     The government refers to abbos1433 as the "administrator of furqon.com" for the following reasons:  In his July email, the defendant asked abbos1433 to contact him at his Skype

> Should I emigrate in the cause of faith or, since we are the
> CLOSEST ONES TO INFIDELS over here and, God willing, we
> have almost everything, what would you say, if, with the help of
> God, we implement a martyrdom act (actions)?  There are military
> installations right here, targets, and vehicles are available as well.
> As I said, first of all we need your advice, we need to pledge to
> Emir, and, to tell you the truth, there are a couple of things that you
> should teach us.  I tried to do a couple of things, as God enabled
> me.  Honestly, I lacked a bit of knowledge.  Just explain which
> wire is where, that's all.[4]

On August 4 and 6, 2012, the defendant and the user of Skype address ahmadi9777 began

Skype chatting about the defendant committing an attack in the United States on behalf of the

IMU.  For example, on September 8, 2012, the defendant wrote ahmadi9777:

> …  But I continue gathering the materials.  Also I go to a place
> where there are more brothers and continue discussing a work with
> them.  …  You also write to me, and I'll read it, even if it is a bit
> late.  And your advices too.

On September 18, 2012, the defendant wrote:

> Turns out, the three-letter ones were following us, so we had to
> change our place.  …  My family and I are ready.  We need to get a
> little more of possessions.  The different prominent places of the
> cities became targets.
>
> We are learning this business, but you are more experienced.
> That's why you teach us the basics.  God willing, it is close.  Or
> even if it's a bit later, we will perform the transaction.

On October 3, 2012, the defendant wrote ahmadi9777:

> We continue with our preparations.  I wrote to you asking for your
> advice.  …  But we are doing fine.  We get anything we want all

---

address, which he provided in the email.  On August 4, 2012, the user of Skype address
ahmadi9777 wrote the defendant:  "Peace be upon you, brother.  You probably recognized me
abbos1433@mail.ru."  On August 29, 2012, ahmadi9777 wrote the defendant:  "Write your reply
to me, when you come.  I am admin at furqon.com …. ."
[4]        This is an English translation of the July email, which was in Uzbek.  Unless otherwise
noted, all communications referenced herein are English translations of Uzbek and Russian
communications.

GOVERNMENT'S TRIAL MEMORANDUM - 3

the time.  It is cheap, but I don't know how to make it and how to put it all together.

Later, the defendant sent photographs of U-Haul trucks to ahmadi9777.  He then wrote:

> There are plenty of these kind of vehicles we have available here, but we have a lot of our personal vehicles too.  In just a regular store, you know, both, the ammonium nitrate and sulphate are available.  Gunpowder is available as well.  There are AK, M16, bullets, everything.  But we need to know how to connect the wires, how much and what to do.  Also, it would be great if we learn how to operate the remotely controlled ones.  While some are operated remotely, others will be by ourselves.  We don't have many people, but it would be great, God willing.

Later that day, ahmadi9777 and the defendant chatted:

> D:    There were book burnings again here yesterday.  One Sheik came out saying, "Go ahead, keep burning.  We will help you ourselves," and sent all of the guys away.  Otherwise the majority was ready to strike.

> A:    May Allah reward those infidels accordingly.  Brother, if we don't respond to them, we'll be held responsible on Judgment Day.

> D:    This is what's going on.  Two of our buddies we had here left, saying, "See what the sheiks are doing?"

> A:    Yes.

> D:    God willing, we are working on our response to them.

> A:    Amen.  May Allah himself help you.  And then, God willing, there is one brother, a wonderful instructor.  God willing, I will consult with that brother.

> D:    Oh, may Allah be pleased, it would be great!  That's what I've been waiting for.  Because we made a couple ourselves and it didn't work.  It came out very crude.  It's not going to work.  You have to come up next to it to light it up, that's why.

Later that day, ahmadi9777 and the defendant chatted:

> D:    Brother, I asked you about the pledge in my previous messages.  Is there a way of doing it, brother?

> …

GOVERNMENT'S TRIAL MEMORANDUM - 4

A:      Yes, brother, you asked about the pledge, but it is a difficult responsibility.

D:      This is how it is.  There are a lot of possible targets here. For example, considering a small number of us, each one of us should take on at least 8 to 10 targets.  If you ask, "Why?", then it's because we went around checking out thoroughly.  One can see that they are not prepared for anything, although they talk a lot.

A:      Oh, yes, very well, brother.  First of all, you should work on making the pledge, and that will be according to Sunna, God willing.

These communications are just an example of the defendant's extensive Skype chats with ahmadi9777.  The defendant and ahmadi9777 chatted almost every month up to the defendant's arrest in May 2013.  In addition to planning an attack in the United States, on December 9, 2012, the defendant agreed to provide Kaspersky anti-virus software to ahmadi9777.

And, in February 2013, the defendant and ahmadi9777 talked about the defendant providing money to the IMU.  The defendant agreed to "open a company" in the United States in order to send money to the IMU.  In late March 2013, while working for a Chicago-based trucking company, the defendant asked the owner of that company to open a business in the defendant's name.  The owner made the necessary arrangements for the creation of the defendant's business.[5]  On May 8, 2013, "Fazzliddin Kurbanov Inc." became an Idaho corporation.

On November 15 and 16, 2012, court-authorized searches of the defendant's Boise apartment were conducted.  During these searches, agents imaged the hard drives of the defendant's two computers, an Acer and an HP.  During the November 16 search, an agent found, photographed and sampled various chemicals and components that could be used to make a bomb.  The samples were sent to the FBI lab for analysis.

---

[5]      The government anticipates that the defendant will argue that, in the trucking industry, it is common practice for drivers to create their own businesses so that they can make more money.

GOVERNMENT'S TRIAL MEMORANDUM - 5

For most of November and December 2012, the defendant temporarily lived in Denver, Colorado, with an FBI confidential human source.[6]  During this time, pursuant to court authority, several of the defendant's conversations were recorded.  On December 17, 2012, the defendant spoke with his brother, who lived overseas, about obtaining Kaspersky anti-virus software.  His brother agreed to send the software to the defendant.  The brother did so via Skype.  For whatever reason, the defendant was unable to download the software at that time.

In January 2013, the defendant attended truck driving school in Salt Lake City.  At the school, the defendant became friends with another FBI confidential human source.  For approximately 11 days, the defendant and source interacted daily.  Their conversations, in English, were recorded.  The defendant eventually left the school and traveled to Chicago to work.

On May 16, 2013, the FBI arrested the defendant at the immigration office in Boise.  The defendant was interviewed at the FBI's Boise office.  After waiving his rights, the defendant spoke with agents.  The interview lasted several hours.  It was audio and video recorded.  In summary, the defendant admitted, in sum and substance, the following:

- The defendant sent Skype communications to the IMU

- The defendant used "aron1156" to communicate with "ahmadi9777"

- The defendant uploaded jihadi videos to his YouTube account "Fazliddin78"

- The defendant had a Facebook account, acknowledging that a screenshot of that account was his

- The defendant knew that the IMU were terrorists

- The name of the IMU website was furqon.com

---

[6]     The defendant's wife and child lived in Boise.  Around November 19, 2012, his wife and child moved in with the defendant's parents at their apartment.

GOVERNMENT'S TRIAL MEMORANDUM - 6

- The IMU asked the defendant for help, including anti-virus software to protect their website, and money

- The defendant studied and learned about bomb-making

- The defendant purchased many if not all the chemicals and components found in his residence

## ELEMENTS OF THE OFFENSES

### COUNTS ONE AND FOUR

The crimes of conspiracy and attempt to provide material support to a designated FTO the IMU, 18 U.S.C. § 2339B, as charged in counts one and four, have similar elements. The conspiracy charge (count one) requires proof that:

1. Between July 2012 and May 16, 2013, there was an agreement between two or more persons to commit the offense of providing material support or resources to the designated FTO the IMU;

2. The defendant became a member of the conspiracy knowing of its unlawful object and intending to help accomplish it;

3. The IMU was a designated FTO;

4. The defendant knew that at least one of the following conditions existed:

   a. That the IMU was a designated FTO; or

   b. That the IMU has engaged or was engaging in terrorist activity; or

   c. That the IMU has engaged or was engaging in terrorism; and

5. The offense occurred in whole or in part within the United States.

The attempt charge (count four) requires proof that:

GOVERNMENT'S TRIAL MEMORANDUM - 7

1. Between July 2012 and May 16, 2013, the defendant attempted to provide material support or resources, namely personnel including the defendant himself, to the designated FTO the IMU;

2. The defendant did something that was a substantial step toward committing the crime;

3. The IMU was a designated FTO;

4. The defendant knew that at least one of the following conditions existed:

    a. That the IMU was a designated FTO; or

    b. That the IMU has engaged or was engaging in terrorist activity; or

    c. That the IMU has engaged or was engaging in terrorism; and

5. The offense occurred in whole or in part within the United States.

The conspiracy and attempt charges do not require proof that the defendant actually provided material support.

<u>COUNTS TWO AND FIVE</u>

The crimes of conspiracy and attempt to provide material support to terrorists, 18 U.S.C. § 2339A, as charged in counts two and five, have similar elements.  The conspiracy charge (count two) requires proof that:

1. Between July 2012 and ending May 16, 2013, there was an agreement between two or more persons to provide material support or resources, namely personnel including the defendant himself; and

2. The defendant became a member of the conspiracy knowing of its unlawful object and intending that such material support or resources be used in preparation for, or in carrying out, a violation of Section 2332a of Title 18 of the United States Code, which makes it a crime for anyone to use, threaten, or attempt or conspire to use a

weapon of mass destruction against any person or property with the United States that would have affected interstate or foreign commerce, or against any property that is owned, leased or used by the United States, or by any department or agency of the United States.

The attempt charge (count five) requires proof that:

1. Between July 2012 and May 16, 2013, the defendant attempted to provide material support or resources, namely personnel including the defendant himself, knowing or intending that the material support or resources be used in preparation for, or in carrying out, a violation of Section 2332a of Title 18 of the United States Code, which makes it a crime for anyone to use, threaten, or attempt or conspire to use a weapon of mass destruction against any person or property with the United States that would have affected interstate or foreign commerce, or against any property that is owned, leased or used by the United States, or by any department or agency of the United States; and

2. The defendant did something that was a substantial step toward committing the crime.

<u>COUNT THREE</u>

The elements of the crime of possessing an unregistered firearm – component parts, 26 U.S.C. § 5861(d), as charged in Count Three, are as follows:

1. The defendant knowingly possessed components that could be readily assembled into a destructive device such as a bomb, grenade or mine;

2. The defendant intended to use the components as a weapon;

GOVERNMENT'S TRIAL MEMORANDUM - 9

3.  The components were not registered to the defendant in the National Firearms

    Registration and Transfer Record, a central registry maintained by the Secretary of

    the Treasury;[7] and

4.  The defendant knew the features of the components that could be readily assembled

    into a destructive device that brought it within the scope of the National Firearms Act.

<u>DEFINITIONS</u>

Definitions for the five charges are:

"**<u>Weapons of mass destruction</u>**" include a destructive device, which is any explosive,

incendiary, or poison gas bomb, grenade, rocket having a propellant charge of more than four

ounces, missile having an explosive or incendiary charge of more than one quarter ounce, mine,

or similar device, or any type of weapon which will, or may be readily converted to, expel a

projectile by the action of an explosive or other propellant, and which has any barrel with a bore

of more than one half inch in diameter; and any combination of parts intended for use in

converting any device into any destructive device and from which a destructive device may be

readily assembled.  *See* 18 U.S.C. §§ 921, 2332a(c)(2) (2012).

As charged in the superseding indictment, the term "**<u>material support or resources</u>**"

means any property, tangible or intangible, or service, including currency or monetary

instruments or financial securities, financial services, and personnel (one or more individuals

who may be or include the defendant), but does not include medicine or religious materials.  *See*

18 U.S.C. §§ 2339B(g)(4), 2339A(b)(1) (2012).

---

[7]     The government does not have to prove that a defendant knew the firearm in his or her possession had to be registered under the NFA.  *See United States v. Freed*, 401 U.S. 601, 607-10 (1971).

GOVERNMENT'S TRIAL MEMORANDUM - 10

The term "**personnel**" means one or more persons, which can include the defendant's own person.  However, no person can be convicted for a violation of this statute in connection with providing personnel unless that person has knowingly conspired to provide a foreign terrorist organization with one or more individuals (who may include the defendant) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization.  Individuals who act entirely independent of the foreign terrorist organization to advance its goals or objectives are not considered to be working under the foreign terrorist organization's direction and control.  *See* 18 U.S.C. § 2339B(h) (2012).

The term "**interstate commerce**" includes commerce between one State, Territory, Possession, or the District of Columbia and another State, Territory, Possession, or the District of Columbia.  *See* 18 U.S.C. § 10 (2012).

The term "**foreign terrorist organization**" has a particular meaning under the statute.  In order for an organization to qualify as a "foreign terrorist organization," the organization must have been designated as such by the Secretary of State through a process established by law, and have been designated at the time the crime occurred, as provided in 8 U.S.C. § 1189.

The term "**terrorist activity**" means any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves the commission of any of the following, or a threat, attempt or conspiracy to do any of the following with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property:

GOVERNMENT'S TRIAL MEMORANDUM - 11

1.        The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle);

2.        The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained;

3.        A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of Title 18) or upon the liberty of such a person;

4.        An assassination;

5.        The use of any biological agent, chemical agent, or nuclear weapon or device, or explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain).

*See* 8 U.S.C. § 1182(a)(3)(B)(iii) (2012).

The term "**terrorism**" means premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents.  *See* 22 U.S.C. § 2656f(d)(2) (2012).

"A person has **possession** of something if the person knows of its presence and has physical control of it, or knows of its presence and has the power and intention to control it." NINTH CIRCUIT MODEL CRIMINAL JURY INSTRUCTION 3.17 (2010).  "More than one person can be in possession of something if each knows of its presence and has the power and intention to control it."  *Id.*

GOVERNMENT'S TRIAL MEMORANDUM - 12

"An act is done **knowingly** if the defendant is aware of the act and does not act or fail to act through ignorance, mistake, or accident."  NINTH CIRCUIT MODEL CRIMINAL JURY INSTRUCTION 5.6 (2010).

The term "**destructive device**" includes "any combination of parts either designed or intended for use in converting any device into a destructive device … and from which a destructive device may be readily assembled."  26 U.S.C. § 5845(f) (2012).  For **unassembled components** to qualify as a "destructive device" there must be proof beyond a reasonable doubt that the components were intended for use as a weapon.  *United States v. Fredman*, 833 F.2d 837, 839 (9th Cir.1987); *United States v. Ruiz*, 73 F.3d 949, 951 (9th Cir. 1996); *United States v. Lussier*, 128 F.3d 1312, 1314 (9th Cir. 1997).

The term "**provide**" means to make available, furnish or supply.

## EVIDENTIARY ISSUES

### Electronically Stored Information ("ESI")

At trial, the government will seek to admit various items of electronically stored information ("ESI"), in the form of chats, emails, social media postings, videos and internet activity.

ESI was obtained via court-authorized searches of the defendant's electronic media.  The searches occurred on November 15 and 16, 2012, and February 27 and May 16, 2013.  In reviewing the evidence from the searches of the defendant's electronic media, investigators obtained Skype communications,[8] videos, photos, a "movie" that was near completion, Google search terms, and URLs visited, all which the government intends to admit as evidence.

---

[8]     In this case, the defendant and his alleged co-conspirator, the user of Skype account ahmadi9777, used Skype to send typed messages to each other.

GOVERNMENT'S TRIAL MEMORANDUM - 13

Criminal search warrants were also obtained for the defendant's Facebook and YouTube accounts.  The government will admit certain evidence from these warrants.

In addition, during the investigation and pursuant to court-authority, the government obtained the defendant's phone calls, emails and online activity.  The government will admit some of this evidence.

The rules of evidence operate the same for ESI as they do for any other item of evidence. Accordingly, with ESI, the court must still examine the admissibility of this evidence under (1) Federal Rule of Evidence 104, which provides the trial court with the authority to decide questions that might make evidence inadmissible under some other rule of evidence (or under the Constitution, a federal statute, or other Supreme Court rules), but does not itself provide a substantive basis for excluding the evidence, s*ee United States v. Evans*, 728 F.3d 953, 960 (9th Cir. 2013); (2) Federal Rules of Evidence 401 and 402 (relevance); and (3) Federal Rule of Evidence 403 (probative value substantially outweighed by danger of unfair prejudice or another factor).

The court is well versed in these evidentiary rules.  For that reason, the government foregoes any further discussion of them.  The government focuses on the other evidentiary rules that impact the admissibility of ESI.

<u>Authentication</u>

"The foundational 'requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.'"  *United States v. Tank*, 200 F.3d 627, 630 (9th Cir. 2000) (citing FED. R. EVID. 901(a); *United States v. Harrington*, 923 F.2d 1371, 1374 (9th Cir.1991)). "The government need only make a prima facie showing of authenticity, as '[t]he

GOVERNMENT'S TRIAL MEMORANDUM - 14

rule requires only that the court admit evidence if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.'" *Tank*, 200 F.3d at 630.(alteration in original) (quoting *United States v. Black*, 767 F.2d 1334, 1342 (9th Cir. 1985). The government must also establish a connection between the proffered evidence and the defendant. *Tank*, 200 F.3d at 630. "[O]nce adequate foundational showings of authenticity and relevancy have been made, the issue of completeness then bears upon the government's burden of proof and is an issue for the jury to resolve, assuming, of course, that the jury has been properly instructed." *United States v. Soulard*, 730 F.2d 1292, 1298 (9th Cir. 1984).

Rule 901(b) provides ten, non-exclusive, methods of how authentication may be accomplished. FED. R. EVID. 901(b) advisory committee's note ("The examples are not intended as an exclusive enumeration of allowable methods but are meant to guide and suggest, leaving room for growth and development in this area of the law."). In authenticating ESI, courts have used a number of Rule 901(b)'s methods, as well as approved some methods not included in that rule.

### *By Witness With Knowledge*

As with other records, ESI may be authenticated under Federal Rule of Evidence 901(b) by a witness with knowledge. FED. R. EVID. 901(b)(1). The rule "contemplates a broad spectrum" including "testimony of a witness who was present at the signing of the document. …" FED. R. EVID. 901(a) advisory committee's note. For example, this permits authentication by a witness who participated in an email or chat communication. *Tank*, 200 F.3d at 630 (prima facie showing of authenticity established concerning chat room log printouts).

*By Agent*

In this case, an investigator familiar with the process used to obtain emails, chat communications and other records from seized electronic media will assist in authenticating these records. For example, an investigator will testify about the process used to obtain the computer records from the seized media. *See, e.g.*, *United States v. Whitaker*, 127 F.3d 595, 601 (7th Cir. 1997) (in drug trafficking case, computer seized from one defendant's residence contained drug transaction and business records; rejecting argument that government was required to supply witness with personal knowledge of computer system; agent testimony authenticated computer records including that computer was seized during warrant execution, agent was present when computer records were retrieved from computer using certain program, and agent testified about his personal knowledge and participation in obtaining records from computer).

The government plans to use "chain of custody" testimony to establish how the government obtained items located on the defendant's media. *See, e.g., United States v. Salcido*, 506 F.3d 729, 733 (9th Cir. 2007) (per curiam) (in child porn prosecution, "the government properly authenticated the videos and images under Rule 901 by presenting detailed evidence as to the chain of custody, specifically how the images were retrieved from the defendant's computers.").

Merely raising the possibility of tampering is not sufficient to render evidence inadmissible. *United States v. Harrington*, 923 F.2d 1371, 1374 (9th Cir. 1991). The possibility of a break in the chain of custody goes only to the weight of the evidence. *Id.* In addition, the prosecution is not required to call the custodian of the evidence. *Id.*

GOVERNMENT'S TRIAL MEMORANDUM - 16

### By Distinctive Characteristics

Under Federal Rule of Evidence 901(b)(4), authentication may be made by distinctive characteristics, which may include "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with the circumstances."  Courts have relied on this rule in admitting email and chat communications bearing distinctive characteristics.  For example, this may include the email addresses used in the communications, the context and circumstances, and other surrounding circumstances.  *See* FED. R. EVID. 901(b)(4) advisory committee's note ("The characteristics of the offered item itself, considered in the light of circumstances, afford authentication techniques in great variety.  Thus a document or telephone conversation may be shown to have emanated from a particular person by virtue of its disclosing knowledge of facts known peculiarly to him; similarly, a letter may be authenticated by content and circumstances indicating it was in reply to a duly authenticated one.  Language patterns may indicate authenticity or its opposite.") (citations omitted); *United States v. Siddiqui*, 235 F.3d 1318, 1322-23 (11th Cir. 2000) (in fraud, false statements, and obstruction case, e mail authenticated by contents and context, including e mail address, automatic reply to sender, the messages indicated knowledge of matter, and use of nicknames; and foreign deposition testimony concerning phone conversations after e-mails were transmitted, applying Rule 901(b)(4)); *United States v. Safavian*, 435 F. Supp.2d 36, 40 (D.D.C. 2006) (e-mails between defendant government official and lobbyist were authenticated by distinctive characteristics under Rule 901(b)(4)including the e-mail addresses used which bore the sender's and recipient's names; "the name of the sender or recipient in the bodies of the e mail, in the signature blocks at the end of the e mail, in the 'To:' and 'From:' headings, and by signature of the sender"; and the contents).

GOVERNMENT'S TRIAL MEMORANDUM - 17

A "hash value" (SHA value) or hash algorithm provides another accepted method to authenticate an electronic document by distinctive means.[9]   A hash value is commonly known as a "digital fingerprint."  *See United States v. Henderson*, 595 F.3d 1198, 1199 n.2, (10th Cir. 2010) (noting that an "SHA value serves as a digital fingerprint" and that "'[n]o two computer files with different content have ever had the same SHA value'" (quoting *United States v. Klynsma*, No. CR. 08–50145–RHB, 2009 WL 3147790 at *6 (D.S.D. Sept. 29,2009)).  In this case, hash values were obtained as part of the media pre- and post-examination process. Computer forensics examiners will testify how these measurements were made during the forensic examination process and the significance of these measurements.  Courts have used "hash values" as one means of authenticating electronic evidence.  *See, e.g.*, *Lorraine v. Markel American Ins. Co.*, 241 F.R.D. 534, 546-47 (D. Md. 2007) ("Hash values can be inserted into original electronic documents when they are created to provide them with distinctive characteristics that will permit their authentication under Rule 901(b)(4)."); *Williams v. Sprint/United Mgmt. Co.*, 230 F.R.D. 640, 655 (D. Kan. 2005) (hash value "allows a large amount of data to be self-authenticating with a rather small hash mark, efficiently assuring that the original image has not been manipulated").

---

[9]      A hash value is defined as "A unique numerical identifier that can be assigned to a file, a group of files, or a portion of a file, based on a standard mathematical algorithm applied to the characteristics of the data set.  The most commonly used algorithms, known as MD5 and SHA, will generate numerical values so distinctive that the chance that any two data sets will have the same hash value, no matter how similar they appear, is less than one in one billion. >Hashing= is used to guarantee the authenticity of an original data set and can be used as a digital equivalent of the Bates stamp used in paper document production."  *Lorraine v. Markel American Ins. Co.*, 241 F.R.D. 534, 546-47 & n.23 (D. Md. 2007) (quoting FEDERAL JUDICIAL CENTER, MANAGING DISCOVERY OF ELECTRONIC INFORMATION 24 (2007)).

GOVERNMENT'S TRIAL MEMORANDUM - 18

*By Comparison*

This rule allows authentication or identification by "[c]omparison by the trier of fact or by expert witnesses with specimens which have been authenticated." FED. R. EVID. 901(b)(3). The specimen used for the comparison with the document to be authenticated must be shown itself to be authentic, which may be accomplished by any means allowable by Rule 901 or 902, as well as by using other exhibits already admitted into evidence at trial, or admitted into evidence by judicial notice under Rule 201. *Markel American Ins. Co.* at 546 (citing 5 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 901.03[7][b] (Mark S. Brodin, ed., Matthew Bender 2d ed. 1997) [hereinafter WEINSTEIN]). This method was used in *United States v. Safavian*, 435 F. Supp.2d 36, 40-41 (D.D.C. 2006), to authenticate certain emails by comparing them to emails that had already been authenticated using Rule 901(b)(4) (distinctive characteristics). *But see Jimena v. UBS AG Bank, Inc.*, 1:07-CV-00367 OWW SKO, 2011 WL 2551413 at *6 (E.D. Cal. June 27, 2011) *aff'd sub nom. Jimena v. Standish*, 504 F. App'x 632 (9th Cir. 2013) (distinguishing *Safavian* and finding that emails sent from publicly available email providers, available to and sendable by anyone, not properly authenticated).

*By Process or System*

This rule permits authentication by "[e]vidence describing a process or system and showing that it produces an accurate result." FED. R. EVID. 901(b)(9). This rule was "designed for situations in which the accuracy of a result is dependent upon a process or system which produces it." FED. R. EVID. 901(b)(9) advisory committee's note. The advisory committee's note makes clear that this rule was designed to encompass computer-generated evidence. *Id.* Regarding ESI, the Ninth Circuit has held that "'[i]t is not necessary that the computer programmer testify in order to authenticate computer-generated records.'" *U-Haul Int'l, Inc. v.*

GOVERNMENT'S TRIAL MEMORANDUM - 19

*Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1045 (9th Cir. 2009) (citing *United States v. Miller*,

771 F.2d 1219, 1237 (9th Cir.1985)).

> *18 U.S.C. § 3505*

Title 18, U.S.C. § 3505 provides the self-authentication process for foreign business

records.  That statute provides that to authenticate foreign business records, the record's

custodian must attest that:

> (A)  such record was made, at or near the time of the occurrence of the matters set
>
> forth, by (or from information transmitted by) a person with knowledge of those
>
> matters;
>
> (B)  such record was kept in the course of a regularly conducted business activity;
>
> (C)  the business activity made such a record as a regular practice; and
>
> (D)  if such record is not the original, such record is a duplicate of the original.

18 U.S.C. § 3505(a)(1) (2006).  "These requirements are substantially similar to the requirements

of Federal Rules of Evidence 803(6) and 902(11)."  *United States v. Anekwu*, 695 F.3d 967, 976

(9th Cir. 2012).  Foreign business records accompanied by an affidavit created to authenticate

them as admissible records are not "testimonial," and thus not subject to confrontation.  *Id.* at

976-77 (citing *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009); *United States v.

Yeley-Davis*, 632 F.3d 673, 679 (10th Cir. 2011)).

"As a general matter, the purpose of Congress in enacting section 3505 was 'to make

foreign kept business records more readily admissible into evidence in criminal trials,' H.R.Rep.

No. 98-907, at 2 (1984), at *reprinted in* 1984 U.S.C.C.A.N. 3578, by creating a 'simple,

inexpensive substitute for the cumbersome and expensive procedures presently required for the

admission of foreign business records.'"  *United States v. Bertoli*, 854 F. Supp. 975, 1029-30

GOVERNMENT'S TRIAL MEMORANDUM - 20

(D.N.J. 1994) *aff'd in part, vacated in part*, 40 F.3d 1384 (3d Cir. 1994) (quoting *United States v. Strickland*, 935 F.2d 822, 830 (7th Cir.1991)). "Put simply, 'section [3505] was not intended to add technical roadblocks to the admission of foreign records, but, rather, to streamline the admission of such records.'" *Bertoli*, 854 F. Supp. at 1029-30 (alteration in original) (quoting *Strickland*, 935 F.2d at 831).

"[T]here must be timely notice of an intention to submit foreign documents" — the opposing party must file objections pre-trial, and the court must rule on objections pre-trial or the opposing party, absent good cause, waives any objection to the admission of the documents. *Id.* at 1030 (citing 18 U.S.C. § 3505(b); *United States v. Hing Shair Chan*, 680 F. Supp. 521, 523-24 (E.D.N.Y.1988)).

A foreign certification under this section also "'serves to authenticate the foreign records, and thus dispenses with the necessity of calling a live witness to establish authenticity.'" *United States v. Jawara*, 474 F.3d 565, 584 (9th Cir. 2007) (quoting *United States v. Hagege*, 437 F.3d 943, 957(9th Cir. 1991)). Certification "'does not require the use of a 'magic form' upon which the employee/record-provider of foreign company must certify that he is aware that his answers come under penalty of perjury.'" *Bertoli*, 854 F. Supp. at 1030 (quoting *Strickland*, 935 F.2d at 831). "A foreign certification serves to authenticate the records so long as specified attestations are met." *Id.* (internal citations omitted). "Finally, section 3505 'did not change the benchmark question in this and every situation involving the admission of documentary evidence: do the documents bear the indicia of reliability?'" *Id.* at 1031 (quoting *Strickland*, 935 F.2d at 831). "Documents are to be admitted under section 3505(a)(1) unless they are shown to be unreliable." *Id.*

GOVERNMENT'S TRIAL MEMORANDUM - 21

*Rejecting Speculative Defense Alteration Claims*

Defense claims that ESI is capable of being altered or modified should not preclude

authentication and should be readily rejected, as other courts have done.  Questions concerning

trustworthiness normally go to the weight of the evidence and not admissibility.  As one court

noted in dismissing a challenge to admit e-mails:

> The defendant argues that the trustworthiness of these e mails
> cannot be demonstrated, particularly those e mails that are
> embedded within e mails as having been forwarded to or by others
> or as the previous e mail to which a reply was sent.  The Court
> rejects this as an argument against authentication of the e mails.
> The defendant's argument is more appropriately directed to the
> weight the jury should give the evidence, not to its authenticity.
> While the defendant is correct that earlier e mails that are included
> in a chain -- either as ones that have been forwarded or to which
> another has replied -- may be altered, this trait is not specific to e
> mail evidence. It can be true of any piece of documentary
> evidence, such as a letter, a contract or an invoice. Indeed, fraud
> trials frequently center on altered paper documentation, which,
> through the use of techniques such as photocopies, white out, or
> wholesale forgery, easily can be altered.   The possibility of
> alteration does not and cannot be the basis for excluding e mails as
> unidentified or unauthenticated as a matter of course, any more
> than it can be the rationale for excluding paper documents (and
> copies of those documents).  We live in an age of technology and
> computer use where e mail communication now is a normal and
> frequent fact for the majority of this nation's population, and is of
> particular importance in the professional world. The defendant is
> free to raise this issue with the jury and put on evidence that e
> mails are capable of being altered before they are passed on.
> Absent specific evidence showing alteration, however, the Court
> will not exclude any embedded emails because of the mere
> possibility that it can be done.

*Safavian*, 435 F. Supp.2d at 41.

<u>Hearsay</u>

Some of the ESI (including e-mails and chat conversations and other records) contain

non-hearsay since the information is not offered to prove the truth of the matter asserted or does

GOVERNMENT'S TRIAL MEMORANDUM - 22

not meet the definition of hearsay under Federal Rule of Evidence 801(c).  For example, machine-generated information does not raise any hearsay issues.

The statements contained in the e-mail, chat communications and other records obtained from the seized media are admissible based on (1) non-hearsay purposes; (2) party-opponent statements; and (3) statements which satisfy an established hearsay exception.  Each basis is considered below.

### Non-Hearsay

Statements introduced for a non-hearsay purpose do not violate the hearsay rule.  *See, e.g.*, *Anderson v. United States*, 417 U.S. 211, 219 (1974) ("Out of court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted."); *United States v. Jaramillo Suarez*, 950 F.2d 1378, 1383 (9th Cir. 1991) (noting that where the probative value of a document "was independent of the truth of its contents, the rule against hearsay was not implicated"; pay-owe sheets introduced for the non-hearsay purpose to show the character of the place, not for the truth of the statements).

### Machine-Generated Information

Some of the evidence at trial will include machine-generated information.  For example, this includes the IP address, logs, date and time and screen name.  Courts have consistently held that machine-generated information is not hearsay as no "person" is making a statement.  *See, e.g.*, *United States v. Hamilton*, 413 F.3d 1138, 1142-43 (10th Cir. 2005) (computer generated "header" information, including the screen name, subject of the posting, the date the images were posted, and the individual's IP address, was not hearsay; no "person" acting as a  declarant).

*Supplying Context*

As noted below, the statements of the defendant on e-mails and chat communications are directly admissible against the defendant under Federal Rule of Evidence 801(d)(2)(A).  The statements of others used in the e-mails and chat communications are admitted not for the truth of the matter but as non-hearsay to supply context.  *See, e.g.*, *United States v. Burt*, 495 F.3d 733, 738-39 (7th Cir.) (in child porn prosecution, Yahoo! chat communication involving defendant and third party found on the defendant's computer, portion from third party was admissible as non-hearsay and provided context to the conversation); *United States v. Dupre*, 462 F.3d 131, 136-37 (2d Cir. 2006) (in wire fraud prosecution, e mails from investors demanding information about defendant's fraudulent scheme were not hearsay when offered not for truth of the assertion that the scheme was fraudulent, but to provide context for the defendant's message sent in response and to rebut defendant's argument that she did not know scheme was fraudulent; no Confrontation Clause issues arose since the statements were offered for a non-hearsay purpose); *Safavian*, 435 F. Supp.2d at 44 (admitting some e-mails which "provide context for the defendant's statements and are not introduced for their truth").

*Establishing Relationship and Custom of Communicating*

The e-mail and chat communications and records seized from the media are also admissible for the non-hearsay purpose to show the relationship of the parties and their custom in communicating.  *See, e.g., United States v. Siddiqui*, 235 F.3d 1318, 1322 (11th Cir. 2000) ("Those [e-mails] sent by Siddiqui constitute admissions of a party pursuant to FED. R. EVID. 801(d)(2)(A), and those between Siddiqui and Yamada unrelated to the NSF investigation are non hearsay admitted to show Siddiqui's and Yamada's relationship and custom of communicating by e mail."); *Safavian*, 435 F. Supp.2d at 44 (e-mails were admissible for non-

GOVERNMENT'S TRIAL MEMORANDUM - 24

hearsay purpose to show the lobbying "work" between lobbyist and government official).  In this case, several e-mails and chat communications will be offered to show the relationship of the defendant and others.

### Party Statements

Federal Rule of Evidence 801(d)(2) recognizes five forms of party admissions as non-hearsay.  The five forms include: party admissions, under Rule 801(d)(2)(A); adopted statements, under Rule 801(d)(2)(B); authorized statements, under Rule 801(d)(2)(C); agency/employee statements, under Rule 801(d)(2)(D); coconspirator statements, under Rule 801(d)(2)(E).  Several statements in this case satisfy the requirements of these rules, as noted below, and therefore are not hearsay.

### Statement of a Party-Opponent

Federal Rule of Evidence 801(d)(2)(A) provides that a party's own statement is directly admissible against the party.  FED. R. EVID. 801(d)(2)(A) advisory committee's note ("A party's own statement is the classic example of an admission.  If he has a representative capacity and the statement is offered against him in that capacity, no inquiry whether he was acting in the representative capacity in making the statement is required; the statement need only be relevant to represent affairs.").

Many of the defendant's statements in this case were memorialized in e-mails and chat conversations.  Not surprisingly, courts have admitted the statements of a defendant (or party-opponent) contained in e-mail or chat communications under Rule 801(d)(2)(A).  As noted above, the statements of others contained in the e-mail and chat conversations in reply to the defendant may be admitted for the non-hearsay purpose to supply context.

GOVERNMENT'S TRIAL MEMORANDUM - 25

*Manifesting an Adoption or Belief*

In some of the e-mail and chat communications, the defendant manifested an adoption or belief of certain statements made by others.  The statements of others are admissible under Federal Rule of Evidence 801(d)(2)(B), which provides that the statements of others may be admitted against the defendant as long as the defendant "manifested an adoption or belief in its truth."  FED. R. EVID. 801(d)(2)(B); *United States v. Williams*, 445 F.3d 724, 735 (4th Cir.) ("The adoptive-admission doctrine permits statements of others to be treated by the jury as statements of the party—it is as if the party himself made the statement.  If someone says in the defendant's presence that 'this is the money the defendant got when he robbed the bank,' it is logical for the jury to conclude that the defendant would have spoken up if he in fact had not robbed the bank.  Thus, a jury would be entitled to treat the robbed-the-bank statement as if it had been made by the defendant himself."; "'When a statement is offered as an adoptive admission, the primary inquiry is whether the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond, and whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement.'"(quoting *United States v. Jinadu*, 98 F.3d 239, 244 (6th Cir. 1996))); *United States v. Kenny*, 645 F.2d 1323, 1340 (9th Cir. 1981) (tape recorded statements of cooperating codefendant's "half of the conversation" admissible "to the extent 'adopted' by Kenny," and may "be treated as a group of adoptive admissions" under the rule).

Courts have recognized that e-mail statements are admissible under this theory where the defendant manifested an adoption or belief in the statement.  *See, e.g.*, *Sea-Land Service, Inc. v. Lozen Intern., LLC*, 285 F.3d 808, 821 (9th Cir. 2002) (trial court abused its discretion in excluding e-mail of company employee which was incorporated and forwarded to by another

GOVERNMENT'S TRIAL MEMORANDUM - 26

employee with a message which "'manifested an adoption or belief in [the] truth' of the information contained in the original e mail."); *Safavian*, 435 F. Supp.2d at 43 (admitting e-mails under Rule 801(d)(2)(B) based on the "context and content of certain e mails" which established the defendant "'manifested an adoption or belief' in the truth of the statements of other people as he forwarded their e mails").

*Co-Conspirator Statements*

A co-conspirator statement is admissible under Rule 801(d)(2)(E) where: (1) the statement was in furtherance of the conspiracy; (2) it was made during the life of the conspiracy; and (3) the defendant and the declarant were members of the conspiracy.  *See generally Bourjaily v. United States*, 483 U.S. 171, 175 (1987).  Co-conspirator statements may be admitted if the declarant is not charged with the crime of conspiracy; any "concert of action creates a conspiracy for purposes of the evidence rule."  *United States v. Portac, Inc.*, 869 F.2d 1288, 1294 (9th Cir. 1989).

The term "in furtherance of the conspiracy" is construed broadly, and includes statements made to "induce enlistment or further participation in the group's activities," to "prompt further action on the part of conspirators," to "reassure members of a conspiracy's continued existence," to "allay a coconspirator's fears," and to "keep coconspirators abreast of an ongoing conspiracy's activities."  *United States v. Yarborough*, 852 F.2d 1522, 1535-36 (9th Cir. 1988).

Once the existence of the conspiracy is established, only "slight evidence" is needed to connect the defendant and declarant to it.  *United States v. Crespo de Llano*, 838 F.2d 1006, 1017 (9th Cir.1988).  Although the government need show only a slight connection with the conspiracy, the independent evidence, "viewed in the light of the coconspirator statements," must be "fairly incriminating."  *United States v. Castaneda*, 16 F.3d 1504, 1507 (9th Cir.1994).

GOVERNMENT'S TRIAL MEMORANDUM - 27

Statements made for personal objectives outside the conspiracy or as part of idle conversation are not admissible under Rule 801(d)(2)(E).  The Ninth Circuit provides judges a "fair degree of latitude" and "flexibility" to admit statements that would otherwise be hearsay.  *United States v. Valdez-Soto*, 31 F.3d 1467, 1471 (9th Cir. 1994); *United States v. Bonds*, 608 F.3d 495, 501 (9th Cir. 2010).  Similarly, although the declarant must be a member of the conspiracy, the witness testifying at trial need not be a member of the conspiracy in order for a coconspirator's statement to be admissible.  *See United States v. Williams*, 989 F.2d 1061, 1067-69 (9th Cir.1993).

The government will introduce co-conspirator statements based on e-mail messages and Skype chat records obtained from the defendant's media, which are admissible under Rule 801(d)(2)(E).  *See, e.g.*, *United States v. Moran*, 493 F.3d 1002, 1010-11 (9th Cir. 2007) (in tax and fraud prosecution, financial records obtained from seized computer were admissible as co-conspirator statements).

### *Hearsay Exceptions*

In addition to the foregoing reasons, some of the computer records obtained in this case may be admissible under well-recognized hearsay exceptions.  This includes: (1) business records; and (2) public records, as set forth below.

### *Computer Business Records*

Business records are admissible as an exception to the rule against hearsay.  FED. R. EVID. 803(6).  *See, e.g.*, *United States v. Baker*, 693 F.2d 183, 188 (D.C. Cir. 1982) ("The justification for this exception is that business records have a high degree of accuracy because the nation's business demands it, because the records are customarily checked for correctness, and because recordkeepers are trained in habits of precision.").  To be admissible, a business record "must (1) 'have been prepared in the normal course of business; (2) . . . have been made at

GOVERNMENT'S TRIAL MEMORANDUM - 28

or near the time of the events it records; and (3) . . . be based on the personal knowledge of the entrant or of an informant who had a business duty to transmit the information to the entrant.'" *Hertz v. Luzenac America, Inc.*, 370 F.3d 1014, 1017 (10th Cir. 2004) (admitting INS computer printout concerning amnesty application) (quoting WEINSTEIN § 803.08[1], at 803-56).

The business records rule expressly applies to a "memorandum, report, record, or <u>data compilation</u>, in any form." FED. R. EVID. 803(6) advisory committee's note (emphasis added). The terms "data compilation" are "used as broadly descriptive of any means of storing information other than the conventional words and figures in written or documentary form. It includes, but is by no means limited to, electronic computer storage." FED. R. EVID. 803(6) advisory committee's note.

Records generated by a computer are admissible under Rule 803(6). In essence, "'it is immaterial that the business record is maintained in a computer rather than in company books.'" *United States v. Catabran*, 836 F.2d 453, 457 (9th Cir. 1988) (computer used to create ledger) (quoting *United States v. De Georgia*, 420 F.2d 889,893 n.11 (9th Cir. 1969)).[10]

*Computer Public Records*

Rule 803(8) allows public records to be admitted as an exception to the rule excluding hearsay. Courts have regularly admitted public records maintained on computer systems under Rule 803(8). *See, e.g., United States v. Lopez Moreno*, 420 F.3d 420, 436-37 (5th Cir. 2005)

---

[10]    The court should note the following caveats given in *De Georgia's* original text: "While, as stated above, it is immaterial that the business record is maintained in a computer rather than in company books, this is on the assumption that: (1) the opposing party is given the same opportunity to inquire into the accuracy of the computer and the input procedures used, as he would have to inquire into the accuracy of written business records, and (2) the trial court, as in the case of challenged business records, requires the party offering the computer information to provide a foundation therefor sufficient to warrant a finding that such information is trustworthy."  *De Georgia*, 420 F.2d at 893 n.11.

GOVERNMENT'S TRIAL MEMORANDUM - 29

(Bureau of Immigration and Customs Enforcement computer records on passenger deportations); *United States v. Enterline*, 894 F.2d 287, 289 (8th Cir. 1990) (computer check on vehicle identification numbers confirming stolen cars); *United States v. Puente*, 826 F.2d 1415, 1417-18 (5th Cir. 1987) (Customs Service TECS system license plate records on vehicle entry into U.S.); *United States v. Neff*, 615 F.2d 1235, 1241-42 (9th Cir. 1980) (IRS submitted Certificate of Assessments and Payments , which was "the product of systematized data storage and retrieval by a public agency charged with the responsibility of maintaining accurate financial and tax information."); *United States v. Orozco*, 590 F.2d 789, 793-94 (9th Cir. 1979) (license plate records).

Best Evidence Rule

Under Rule 1001(d), an original is the writing or recording itself, a negative or print of a photograph or, "[f]or electronically stored information, any printout—or other output readable by sight—[that] accurately reflects the information." Fed. R. Evid. 1001(d).

Under Rule 1001(e), a "duplicate" is "a counterpart produced by a mechanical, photographic, chemical, electronic, or other equivalent process or technique that accurately reproduces the original." Fed. R. Evid. 1001(e) (emphasis added).

A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original, or (2) under the circumstances, it would be unfair to admit the duplicate instead of the original. Fed. R. Evid. 1003.

In the context of ESI:

> Computer-based business records commonly consist of material originally produced in a computer (*e.g.*, business memoranda), data drawn from outside sources and input into the computer (*e.g.*, invoices), or summaries of documents (*e.g.*, statistical runs). The admissibility of computer-based records to prove their is subject to the best evidence rule set out in Rule 1002. The rules generally

> require the original of a writing when the contents are at issue, except that a 'duplicate' is also admissible unless a genuine issue is raised about its authenticity. A duplicate includes ["]a counterpart produced by an electronic . . . process or technique that accurately reproduces the original." Courts often admit computer-based records without making the distinction between originals and duplicates.

WEINSTEIN at § 900.07[1][d][iv] (citation omitted).  Further, "[t]he best evidence rule applies when the contents of a writing are sought to be proved, not when records are searched and 'found not to contain any reference to the designated matter.'"  *United States v. Valdovinos-Mendez*, 641 F.3d 1031, 1035 (9th Cir. 2011) (quoting FED. R. EVID. 1002 advisory committee's note).

<u>Summaries</u>

The government intends to introduce summary evidence, of which it has provided notice to the defense.  Rule 1006 provides: "The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court."  FED. R. EVID. 1006.  The advisory committee's note recognizes that Rule 1006 is one of necessity, as the "admission of summary of voluminous books, records, or documents offers the only practicable means of making their contents available to judge and jury." FED. R. EVID. 1006 advisory committee's note.

The writings, recordings or photographs to be summarized must be voluminous, such as where the information is "unmanageable" or "when the summaries would be useful to the judge and jury." *United States v. Rizk*, 660 F.3d 1125, 1130 (9th Cir. 2011).  A proponent of summary evidence must establish that the underlying materials upon which the summary is based (1) are admissible in evidence and (2) were made available to the opposing party for inspection.  *Id.* (citing *Amarel v. Connell*, 102 F.3d 1494, 1516 (9th Cir.1996)).  These materials must be

GOVERNMENT'S TRIAL MEMORANDUM - 31

admissible, but need not themselves be admitted into evidence.  *United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir. 1988).  The summaries themselves constitute the evidence of the contents of the materials, rather than the underlying writings, recordings or photographs.  *United States v. Wood*, 943 F.3d 1048, 1053 (9th Cir.1991).

<u>Participant's Understanding of What is Being Said</u>

The government will admit a number of recorded conversations in which the defendant is talking to other people.  These conversations are at times abbreviated, composed of unfinished sentences and periodically punctuated with coded or ambiguous references to intentions, events and consequences.  The government anticipates calling some of the people who participated in these conversations and asking them "what did you understand the defendant to mean when he said [insert statement]?"  This line of questioning is permissible so long as it is based on the witness's perception and helpful to the jury's understanding of the conversation or a fact in issue.

While lay witnesses are normally not permitted to testify about their subjective interpretations or conclusions as to what has been said, *see United States v. Cox*, 633 F.2d 871, 875 (9th Cir. 1980), under Federal Rule of Evidence 701, some lay expressions of opinion or inference are permitted provided they are rationally based on perception of a witness and helpful either to an understanding of the testimony of the witness on the stand or to the determination of a fact in issue.  *Id.*

## OTHER ISSUES

<u>Prior Convictions of Witnesses</u>

The government notifies the defense of prior criminal convictions of its potential witnesses.  Because none of the prior convictions are admissible, the government objects to any attempt by the defendant to place them before the jury.  The government requests that, if the

defendant intends to elicit the prior convictions, the defendant should first request a hearing

outside the presence of the jury.

*Summary of Government's Witnesses' Prior Convictions*

Witnesses whom the government may call at trial have the following prior criminal

convictions:

1.      K.M.:   (1) misdemeanor driving under the influence in 2009; (2) misdemeanor failure to

purchase or invalid driver's license in 2010 and 2014; (3) misdemeanor inattentive driving in

1995.

2.      D.G.:  (1) misdemeanor possession of an open container in 2013; (2) misdemeanor failure

to purchase or invalid driver's license in 2009; (3) misdemeanor driving under the influence in

2010.

3.      S.K.:  (1) misdemeanor disorderly conduct in 2012.

*Overview of the Admissibility of Prior Convictions*

Federal Rule of Evidence 609(a), which governs the admission of prior convictions,

provides, in pertinent part, as follows:

> (a)  In General.  The following rules apply to attacking a witness's
> character for truthfulness by evidence of a criminal conviction:
>
> (1) for a crime that, in the convicting jurisdiction, was punishable
> by death or by imprisonment for more than one year, the evidence:
>
> (A) must be admitted, subject to Rule 403, in a civil case or in a
> criminal case in which the witness is not a defendant;  …
>
> (2) for any crime regardless of the punishment, the evidence must
> be admitted if the court can readily determine that establishing the
> elements of the crime required proving –or the witness's
> admitting– a dishonest act or false statement.

FED. R. EVID. 609(a).  Hence, Rule 609(a)(1) allows the admission into evidence of a prior

felony conviction if the conviction's probative value is not substantially outweighed by its

GOVERNMENT'S TRIAL MEMORANDUM - 33

prejudicial effect.  Subsection (a)(1)'s general Rule 403 balancing test protects "all litigants

against unfair impeachment of witnesses."  *United States v. Rowe*, 92 F.3d 928, 933 (9th Cir.

1996) (citing FED. R. EVID. 609 advisory committee's note).  In *Rowe*, the Ninth Circuit found

that the district court had acted within its discretion when, in a carjacking trial, it excluded the

seven-year-old auto theft conviction of a government witness because the crime had "a lot of

prejudice and almost no probative value."  *Id.*

      Under subsection (a)(2), prior misdemeanor convictions also are admissible if they

involve dishonesty or false statement.  The term "dishonesty" means only those crimes that

involve some element of deceit, untruthfulness or falsification bearing on the witness's

propensity to testify truthfully.  *See United States v. Brackeen*, 969 F.2d 827, 830 (9th Cir. 1992)

(citing FED. R. EVID. 609 advisory committee's note and BLACK'S LAW DICTIONARY 335

(5th ed. 1979)).  Dishonesty within the meaning of Rule 609(a)(2) refers to an inclination not to

tell the truth.  *United States v. Ortega*, 561 F.2d 803, 806 (9th Cir. 1977).  Convictions for crimes

such as perjury, false statement, fraud, embezzlement or false pretense suggest that the witness,

once having deceived, lied, or falsified, may do so again.  *Id.*  Driving offenses are clearly

inadmissible under Rule 609.

      Drug crimes, assaults and sex crimes are not offenses involving dishonesty under Rule

609(a)(2).  *United States v. Colbert*, 116 F.3d 395, 396 (9th Cir. 1997) (lewd conduct conviction

does not involve dishonesty); *Medrano v. City of Los Angeles*, 973 F.2d 1499, 1507 (9th Cir.

1992) (drug use and shoplifting convictions do not involve dishonesty).  Theft, burglary and

receiving stolen property are not per se offenses involving dishonesty under Rule 609(a)(2).  *See*

*United States v. Glenn*, 667 F.2d 1269, 1272-73 (9th Cir. 1992).  A criminal conviction for theft

or burglary may be admissible under Rule 609(a)(2) if the crime was actually committed by

GOVERNMENT'S TRIAL MEMORANDUM - 34

fraudulent or deceitful means.  *Id.* at 1273; *United States v. Foster*, 227 F.3d 1096, 1100 (9th Cir. 2000).

Rule 609 places a time limit on the use of prior convictions.  For convictions where "more than ten years have passed since the witness's conviction or release from confinement for it, whichever is later[,] evidence of the conviction is admissible only if: (1) its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and (2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use."  FED. R. EVID. 609 (b).

Rule 609(d) provides that evidence of juvenile adjudications is admissible only if it is offered in a criminal case against a witness, not a defendant, the adjudication is for an offense that would be admissible to attack credibility if it were an adult conviction, and the adjudication's admission is necessary to fairly determine guilt or innocence.  *See* FED. R. EVID. 609(d).

Even where Rule 609 authorizes the introduction of witnesses' prior convictions, such evidence is not admissible unless and until the witness testifies at trial.  *Coursey v. Broadhurst*, 888 F.2d 338, 343 (5th Cir. 1989) ("[T]he proper time to impeach a witness with a prior … conviction is when that witness is on the witness stand, not during an advocate's opening argument to the jury," but finding harmless error where impeachment evidence admitted during opening statement because it did not prejudice substantial rights).  Until such time as the witness takes the stand, any mention of his or her criminal convictions would amount to improper impeachment evidence, impermissible under the Federal Rules of Evidence.  Further, once a witness takes the stand, any impeachment of that witness by criminal convictions must strictly conform to the time and subject matter requirements of Rule 609.  It is error to ask the witness

about the details of the prior conduct.  *See United States v. Yarborough*, 352 F.2d 491, 493 (6th Cir. 1965).  Rather, the scope of the inquiry is limited to the fact, offense and date of conviction. *United States v. Dow*, 457 F.2d 246, 250 (7th Cir. 1972).

*Admissible Prior Convictions of Possible Government Witnesses*

The government does not object to the admission into evidence of the following prior convictions for the following witnesses:

1.      S.K.:  (1) misdemeanor disorderly conduct in 2012.

All other potential government witnesses' prior convictions are misdemeanor driving offenses that do not involve dishonesty or were not accomplished by deceitful means and/or are older than ten years.  Thus, the government objects to the admission of these prior convictions unless and until the defense makes a showing, outside the presence of the jury, that these prior convictions should be admitted into evidence under Rule 609.  The government requests that, if the defendant seeks to admit any of these prior convictions, other than those agreed to by the government in this brief, then the defendant should first request a hearing outside the presence of the jury.

Respectfully submitted this 29th day of June, 2015.


WENDY J. OLSON
UNITED STATES ATTORNEY
By:


/s/_____
AARON N. LUCOFF
Assistant United States Attorney

/s/_____
HEATHER S. PATRICCO
Assistant United States Attorney

/s/_____
LAWRENCE SCHNEIDER
U.S. Department of Justice Trial Attorney
Counterterrorism Section


CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 29, 2015, the foregoing **GOVERNMENT'S TRIAL**

**MEMORANDUM** was electronically filed with the Clerk of the Court using the CM/ECF

system which sent a Notice of Electronic Filing to the following person(s) by:

| Charles F. Peterson, Jr.<br>Courtney Peterson<br>913 W. River St., Ste. 420<br>Boise, Idaho 83702<br>chuck@petersonlawyers.com<br>Courtney@petersonlawyers.com | ECF filing |
|---|---|


/s/ _____
Aaron Lucoff


GOVERNMENT'S TRIAL MEMORANDUM - 37