Charles F. Peterson ISB No. 3346
Courtney M. Peterson ISB No. 8002
PETERSON LAWYERS
913 W. River Street, Suite 420
Boise, Idaho  83702-7081
Telephone (208) 342-4633
FAX (208) 336-2059

Attorneys for Defendant

UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                                   Plaintiff,<br><br>vs.<br><br>FAZLIDDIN KURBANOV,<br><br><br>                                   Defendant. | Case No. CR-13-120-S-EJL<br><br>DEFENDANT'S TRIAL BRIEF |

1. **INTRODUCTION**

Fazliddin Kurbanov is charged with conspiracy and/or attempting to provide material support to a designated foreign terrorist organization, the Islamic Movement of Uzbekistan (IMU) in Counts One and Four. In Counts Two and Five, he is charged with conspiracy and/or attempting to provide material support to terrorists. Count Three alleges that he knowingly possessed an unregistered destructive device, essentially parts that could be readily assembled into a destructive device. The actual elements of each count and the potential defenses to each have earlier been provided to the Court in an *Ex Parte* Response to Order (Dkt. 97). Defendant denies each of the claims advanced by the Government. Mr. Kurbanov never agreed or attempted to provide material support to the

IMU or to terrorists as alleged (by providing personnel, money or software); nor did he possess an unregistered destructive device.

## 2. EVIDENTIARY ISSUES AND THE 13TH MOTION IN LIMINE

(A)  **Pending Motions** - The parties have been informed that the Court does not intend to provide a hearing on the motions in limine filed by the parties, the request for a *Daubert* hearing on Evan Kohlmann, or the other pending motions.

(B)  **13th Motion In Limine** – Three weeks after the deadline for the filing of motions in limine had passed, the Government filed its 13th Motion In Limine, intended to preclude the Defendant from eliciting testimony and admitting evidence of the opinions of its employees and agents in email or otherwise. This issue was raised, according to the United States, by defendant's response to the Government's sixth motion in limine. In view of the Court's position with respect to the other filed motions in limine, the Defendant objects to the 13th Motion In Limine and expects this will be the subject of an objection at trial by the Government if raised.

(C)  **Translations** – Defendant is currently going through the translations provided in discovery (June 18, 2015) with his consultant. There are forty translations to review. We expect to be able to lodge objections by July 7th.

(D)  **Jamoliddin Kurbanov Testimony By Skype** – Defendant expects to file a motion to permit Fazliddin's brother Jamoliddin Kurbanov to testify by Skype. He lives outside the United States and is not available to travel for trial. The Government is expected to offer into evidence a translated conversation between he and Fazliddin concerning information regarding the use of Kaspersky Anti-Virus software. Jamoliddin will testify that he did not transfer software for the IMU to his brother and provide an

explanation for the jury as to what he attempted to transfer. He will also testify that he did not receive money for the IMU from his brother or family in the United States, and that he did not send any money to the IMU. He will provide context and background concerning his brother's actions, and contest the Government's translation / interpretation of the conversations.

(E)     **Email and Skype Conversations** – The Government is expected to offer into evidence portions of various email and Skype conversations, containing statements by a person purporting to represent the IMU, and purporting to be an "administrator" for the website furqon.com. The Government contends that website was the "official" website of the IMU at the time. In recent disclosures the Government concedes that more than one person may have used the identified himself as the administrator(s) of furqon.com, and that administrators use multiple email addresses. Whether it was the "official" website of the IMU, and whether "ahmadi9777" is one person or several, and whether the person or persons communicating with Mr. Kurbanov was in fact an administrator will certainly require some foundation. The same is true of "abbos1433 @mail.ru." This is the Nigerian Prince problem – he frequently sends counsel emails looking for a means to help him collect $50 million that he claims is owed him, and is willing to pay a contingent fee. That he says he is a Nigerian Prince, does not make it so. Such claims may not be authentic. The same is true of the claimed administrators of the website at issue here.

(F)     **Presence of the Defense Investigator in the Courtroom** – Inevitably, the Government will have an investigator or Special Agent in the Courtroom, and perhaps at counsel table to assist in presentation of the case. Within the Ninth Circuit, courts

**Kurbanov Trial Brief - 3**

routinely permit the Government's investigative officer to remain in the courtroom and sit at the table as a representative, and also testify during the trial. See, *U.S. v. Valencia-Riascos*, 696 F.3d 938 (9th Cir. 2012). The practice is generally permitted as an exception to the rule of exclusion under Fed.R.Evid. 615. Defendant requests the Court exercise its discretion to permit its investigator Terry Murphy to not be excluded under the Rule. Mr. Murphy has been used in this capacity in the past in state court, and his presence during portions of the trial as an observer benefits the Defendant in a number of ways. First, the investigator has interviewed witnesses and assisted in preparing the defense. He may be useful in focusing counsel on an area of the case that can reduce time on cross-examination. Second, he may be relied upon to review his notes and assist in directing counsel to relevant attacks on credibility or relevant evidence. Third, he may be called on to retrieve relevant information or possible exhibits during the course of the trial, again focusing the case and potentially reducing time. Mr. Murphy will not be present at all times, and it is expected that he may testify at trial. By permitting his presence in the courtroom the Defendant gains no advantage than is occasioned by the United States having the presence of its agent at counsel table. Counsel has no interest in having Mr. Murphy sit at counsel table, nor will he be a conspicuous part of the defense during the trial. He will likely appear to be another interested spectator.

3.  **VOIR DIRE**

Mr. Kurbanov's Requsted Voir Dire is also filed today. These matters follow logically upon those raised in the Questionnaire that prospective jurors will complete on July 7. In a post-9/11 America, topics and opinions regarding Islam, terrorism, and bombs are highly charged. The allegations in this case may make it extremely difficult to

find untainted jurors who can start with the presumption of innocence. This is especially so where the Government has raised the question of whether to shield the identities of its confidential human sources and its interpreters, by motions filed *in limine*, containing matters were designated "sensitive" discovery. In the end, jurors will hear the facts and then decide whether there is proof beyond a reasonable doubt of any crime, but choosing those jurors in today's "terror environment" is likely to remain a real challenge.

The voir dire of the panel by the Court should inquire into the potential jurors' racial prejudices where (1) the defendant is accused of a violent crime and he and the victim are of different racial or ethnic groups, or (2) "external circumstances of the case indicate a reasonable possibility that racial or ethnic prejudice will influence the jury's evaluation of the evidence." *United States v. Sarkisian*, 197 F.3d 966, 979 (9th Cir. 1999) (quoting *Rosales-Lopez v. United* States, 451 U.S. 182, 192-93 (1981).) Mr. Kurbanov is a refugee from Uzbekistan, a Central Asian country with tribal similarities to those of the people of Pakistan and Afghanistan. His country and most of Central Asia is culturally and historically Muslim. Although no actual crime of violence occurred, he is accused of plotting to build bombs and then attack Americans. These facts make such inquiry essential.

Even people who would condemn racial profiling of African-Americans or other minority group members often conclude such profiling is warranted in the case of those from the Middle East. *See generally* Stephen J Ellman, Racial Profiling and Terrorism, 46 N.Y.L. Sch. L. Rev. 675 (2003). A recent survey showed that forty percent (40%) of

Americans believe Islam is more likely than other religions to encourage violence, and nearly half of Americans believe Islam is incompatible with American values.[1]

Whatever the impact of time has had on rational analysis of the risks of terrorist attacks on the United States, the popular press typically avoids talking about the real numbers and the real threat posed by proclaimed Muslim terrorists. In an article published in the New York Times,[2] Charles Kurzman and David Schanzer point out that the headlines mislead. "The main terrorist threat in the United States is not from violent Muslim extremists, but from right-wing extremists." They surveyed 382 law enforcement agencies, and found that "74 percent reported anti-government extremism as one of the top three terrorist threats in their jurisdiction; 39 percent listed extremism connected with Al Qaeda or like minded terrorist organizations. And only 3 percent identified the threat from Muslim extremists as severe, compared with 7 percent for anti-government and other forms of extremism."[3]

"Since 9/11, an average of nine American Muslims per year have been involved in an average of six terrorism-related plots against targets in the United States. Most were disrupted, but the 20 plots that were carried out accounted for 50 fatalities over the past 13 and a half years."[4] In contrast, for example, "there have been more than 215,000 murders in the United States since 9/11. For every person killed by Muslim extremists, there have been 4300 homicides from other threats."[5] While it is clear that the numbers

---

[1] *See Continuing Divide In Views of Islam and Violence*, PEW RESEARCH CENTER (Mar.9, 2011), http://pewresearch.org/pubs/1921/poll-islam-violence-more-likely-other-religions-peter-king-congressional-hearings; *What It Means To Be An American: Attitudes In An Increasingly Diverse America Ten Years After 9/11*, THE BROOKINGS
[2] *The Growing Right-Wing Terror Threat*, New York Times (June 16, 2015)
[3] Id.
[4] Id.
[5] Id.

don't lie, the headlines across the world[6] and videotaped be-headings of beach-goers in Tunisia and Christians by ISIS and other terrorists continue to do as intended; terrorize Americans into believing that Muslims represent risk.

In his sixth yearly analysis of terrorism cases involving American Muslims, Charles Kurzman, a professor of Sociology reports that in 2014, twenty-five such cases arose in the United States. Of those, 5 involved persons whoe traveled to join designated terrorist organizations in Syria, and 14 involved attempted travel. Only 6 of those cases involved persons plotting or engaged in violence in the United States, matching the lowest total since 2008. Four terrorism-related incidents – two using firearms, one a knife, and one a hatchet – killed seven people in 2014, bringing the total number of fatalities in the United States from terrorism by Muslim-Americans since 9/11 to 50.[7]

Because this case involves evidence regarding Islamic extremism and radical political sentiment, racial or ethnic prejudice is almost certain to influence potential jurors. The Government's case represents the entire specter of terrorism. The case is likely to be extremely sensitive, and emotionally charged. Comments allegedly made by the defendant have already appeared in the press indicating an interest in martyrdom and terrorism. Regardless of who is asking questions, there are serious questions to be asked of each and every potential juror. The ten questions requested by the defendant are intended to facilitate a discussion with potential jurors on these important issues.

---

[6] For example yesterday: *French Assailant Texted Beheading Photo to Canadian Number*, New York Times (June 28, 2015). Implicitly the reminder is not lost on readers, Islamic terror includes beheading, and the "selfie" of Yassine Salhi was sent to someone in Canada.
[7] *Terrorism Cases Involving Muslim-Americans In 2014*, Charles Kurzman, http://sites.duke.edu/tcths/files/2013/06/Kurzman_Terrorism_Cases_Involving_Muslim-

4.     **ATTORNEY-CONDUCTED VOIR DIRE**

After Court-conducted voir dire, the defense requests the Court exercise its discretion under Rule 24 (a) of the Federal Rules of Criminal Procedure to allow extensive counsel-conducted voir dire. While Court-conducted voir dire is an essential step in the process of probing juror attitudes, the court should permit more than the usual 30 minutes of counsel-conducted voir dire. Public attitudes concerning Muslims in America are so clearly one-sided that due process should require a more extensive inquiry. *See* Judge Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of Batson, and Proposed Solutions*, 4 Harv. L. & Pol'y. Rev. 149, 160 (Winter 2010) ("As district court judge for over fifteen years, I cannot help but notice that jurors are all too likely to give me the answer that they think I want, and they almost uniformly answer that they can 'be fair.'").

Counsel in this case are deeply familiar with the issues and will be able to follow-up on matters the Court might not identify as areas of risk. The combination of the jury questionnaire, Court-directed voir dire, and counsel-conducted voir dire, is best able to deal with the inherent problems associated with terrorism-related cases such as this. A motion to permit more than the standard thirty-minutes of counsel conducted voir dire is filed with this Brief.

5.     **SEQUESTERED QUESTIONING**

The Court should facilitate sequestered voir dire for individual jurors who express reluctance to answer questions before the rest of the panel. Individually questioning

---

Americans_2014.pdf. See also, *Homegrown Extremists Tied to Deadlier Toll Than Jihadists in U.S. Since 9/11*, New York Times (June 24, 2015), http://nyti.ms/1K9lNvl.

Kurbanov Trial Brief - 8

jurors separately for voir dire serves the same purposes as having the jurors privately fill out a written questionnaire – jurors are more likely to answer honestly if they are not required to volunteer potential embarrassing information in a room full of people. The Court should also be alert to the risks of questioning potential jurors about their knowledge of pretrial publicity before the entire venire. See *King v.Lynaugh*, 850 F.2d 1055, 1068 (5th Cir. 1988) ("[W]hen the record reveals a significant possibility that pretrial publicity has prejudiced the venire, the district court is obligated to conduct individual voir dire to assure impartiality."). This highly publicized and emotionally charged case presents the circumstances under which individualized and sequestered voir dire may be required to guard against extraordinarily high risks of illegitimate prejudice and prejudgment of the issues.

6.      **EXTRA DEFENSE PEREMPTORY CHALLENGES**

This Court has discretion to grant additional peremptory challenges in cases involving sensitive subject matter and highly charged issues. See *Rosales-Lopez v. United States*, 451 U.S. 182(1981) (broad discretion of trial court in voir dire process); *United States v. Springfield*, 829 F.2d 860, 864 (9th Cir. 1987) (in a single defendant case the court held that "the award of additional peremptories is not mandatory, but permissive, and rests in the trial court's sound discretion"). Allowing the defense three extra peremptory challenges will render the process more fair and help offset the risks of unfair prejudice caused by pretrial publicity as well as the emotionally charged and culturally complex issues presented by the allegations against Mr. Kurbanov.

The extra peremptory challenges should be viewed as a complement to voir dire. "Voir dire examination serves the dual purposes of enabling the court to select an

impartial jury and assisting counsel in exercising peremptory challenges." *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991). "Voir dire provides a means of discovering actual or implied bias and a firmer basis upon which the parties may exercise their peremptory challenges intelligently." *J.E.B. v. Alabama*, 511 U.S. 127, 143-44 (1994). "The principal value of the peremptory is that it helps produce fair and impartial juries." Id. at 147 (O'Connor, J., concurring). In other words, the full effect of voir dire is achieved only if the Court and parties can ensure that biased jurors are not empaneled. In a case such as this one, involving sensitive subject matter and highly charged issues, additional peremptory challenges are necessary to provide the best chance for a fair jury.

**7.     JURY INSTRUCTIONS**

Mr. Kurbanov's jury instructions are also provided today. Additional requested instructions are likely, depending on the evidence admitted at trial.

Dated this 29th day of June, 2015.

//s//
Charles F. Peterson
Attorney for Defendant

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that on the 29th day of June, 2015, I caused a true and correct copy of the foregoing document to be served upon the following person(s) in the following manner:

[ ]    U.S. Mail, Postage Prepaid
[ ]    Express Mail
[ ]    Hand Delivery
[ ]    Facsimile Transmission –
[ ]    Federal Express
[**X**]    Electronic Transmission


Wendy Olson
Aaron N. Lucoff
Heather S. Patricco
Lawrence Schneider
United States Attorney's Office
Washington Group Plaza IV, Suite 500
800 East Park Boulevard
Boise, ID 83712

          //s//
          Charles F. Peterson

**Kurbanov Trial Brief -  11**