WENDY J. OLSON, IDAHO STATE BAR NO. 7634
UNITED STATES ATTORNEY
AARON N. LUCOFF, IDAHO STATE BAR NO. 5707
HEATHER S. PATRICCO, DISTRICT OF COLUMBIA STATE BAR NO. 465883
ASSISTANTS UNITED STATES ATTORNEYS
LAWRENCE SCHNEIDER, NEW YORK STATE BAR NO. 2594174
UNITED STATES DEPARTMENT OF JUSTICE TRIAL ATTORNEY
WASHINGTON GROUP PLAZA IV
800 EAST PARK BOULEVARD, SUITE 600
BOISE, ID 83712-7788
TELEPHONE: (208) 334-1211
FACSIMILE:  (208) 334-1413

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>     vs.<br><br>FAZLIDDIN  KURBANOV,<br><br>              Defendant. | Case No. 1:13-cr-00120-EJL<br><br>**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION** |

        The United States of America, through its undersigned counsel, submits this sentencing

memorandum and response to defendant's presentence report ("PSR") objections and motion for

a variance.  The government recommends the court impose a sentence of imprisonment of 420

months.

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 1**

## I.    PROCEDURAL BACKGROUND

On May 16, 2013, a federal grand jury returned a three-count indictment charging defendant with conspiracy to provide material support to a designated foreign terrorist organization; conspiracy to provide material support to terrorists; and possession of an unregistered firearm (destructive device) (ECF No. 1).  Thereafter, on November 14, 2014, a five-count superseding indictment was returned adding two additional counts: attempt to provide material support to a designated foreign terrorist organization and attempt to provide material support to terrorists (ECF No. 74).

On August 12, 2015, following a month-long trial, the jury returned verdicts of guilty on three of the five counts, conspiracy and attempt to provide material support to a designated foreign terrorist organization and possession of an unregistered firearm.

On October 6, 2015, the initial PSR was issued (ECF No. 262).  Defendant objected to three of its calculations: (1) the two-level adjustment for obstruction of justice; (2) the 12-level terrorism enhancement; and (3)  the punishment for his convictions for attempt and conspiracy under 18 U.S.C. § 2339B amount to duplicative punishment (ECF No. 270). The final PSR denied the objections (ECF No. 272).  Defendant also filed a variance motion, arguing the terrorism enhancement was too severe, (ECF No. 274), and a sentencing memorandum asking the court to impose a 15-year sentence (ECF No. 275).  The government now files this sentencing memorandum, response to defendant's PSR objections, and response to defendant's variance motion.  The government concurs with the initial and revised PSR guidelines calculations.  Defendant's adjusted offense level is 42 and his criminal history category is VI, resulting in a guideline range of 360 to 480 months.  The government recommends the court impose a 420 month prison sentence, the mid-range of the guidelines.

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 2**

## II.    RESPONSE TO DEFENDANT'S PRESENTENCE REPORT OBJECTIONS

### A.    OBSTRUCTION OF JUSTICE

The sentencing guidelines provide an upward adjustment of two-levels for a defendant who obstructs or attempts to obstruct justice. *See* U.S. SENTENCING GUIDELINES MANUAL §3C1.1. Such an increase is appropriate both where a defendant commits perjury and where a defendant provides material false statements to law enforcement officers. *Id.* at cmt. n.4(B) & 4(G). Both bases for an obstruction enhancement apply here.

A defendant commits perjury for purposes of § 3C 1.1 if, while under oath, he "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

"Willful" means that the defendant engaged in intentional or deliberate acts. *United States v. Gilchrist*, 658 F.3d 1197, 1206 (9th Cir. 2011). In addition, the lie must concern a material issue. *United States v. Jimenez*, 300 F.3d 1166, 1171 (9th Cir. 2002). The district court must make a finding that the defendant's false statement was material. *United States v. Jimenez-Ortega*, 472 F.3d 1102, 1104 (9th Cir. 2007). For a defendant's false statement to be material, it is not necessary that the false statements actually mislead, only that they have the potential for doing so. *United States v. Baker*, 894 F.2d 1083, 1084 (9th Cir. 1990). If the district court finds the defendant willfully obstructed justice, the increase in two levels is mandatory, not discretionary. *United States v. Ancheta*, 38 F.3d 1114, 1118 (9th Cir. 1994).

Here, the two-level obstruction enhancement should apply because defendant made false statements to FBI agents when he was arrested and because he perjured himself when he testified under oath at trial. Defendant's false statements to investigators and under oath are exactly the

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 3**

type of conduct that the obstruction enhancement was designed to punish. His false statements to investigators were designed to provide innocent explanations for his conduct, thereby thwarting the investigation. His perjury at trial was chronic, occurring over the course of the three days that he was on the stand, and designed to secure his acquittal. Accordingly, the court should deny defendant's objection and apply the obstruction enhancement. The most significant perjurious statements are recounted below.

       1.    <u>Defendant's Reasons for Communicating with the IMU</u>

Defendant was arrested by the FBI on May 16, 2013. Thereafter, he told the FBI during his post-arrest interview that he initiated contact with the Islamic Movement of Uzbekistan (IMU). At that time, defendant provided three reasons for doing so (which he also provided during his testimony at trial). The first reason was to learn about the intentions of the IMU with regard to fighting Uzbek President Islam Karimov's regime. The second was to locate a childhood friend. The third was to assist U.S. law enforcement in capturing the IMU. *Gov't. Ex. 1002*. Over two years later, at trial, defendant testified that there was a fourth reason that he maintained contact with the IMU: so that he would not be "blocked" from using the IMU's official website, furqon.com.

Defendant's post-arrest statements, as well as his explanations at trial for his conduct, were false and in stark contrast to the evidence. Despite his claim of contacting the IMU to learn the IMU's intentions, defendant's Skype communications, recovered from his computers and phones, contain no inquiries by defendant about the IMU's intentions. Over a 10-month period defendant discussed targets, bomb-making, where and how to send money overseas and anti-virus software to protect the IMU websites – activities that would indicate he sought to provide himself and other material support to the IMU. Never did defendant inquire about the

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 4**

IMU's struggle against President Karimov.  He didn't ask because he was contacting the IMU to conduct an attack in the United States, and not, as he testified, to learn about the IMU's activities against the Uzbek government.

Similarly, defendant never asked the IMU about his childhood friend.  At trial, defendant testified that the IMU wouldn't know his friend, so he never asked.  This is another story that defendant fabricated to hide his true criminal intent.  At trial, based on the Skype communications between defendant and the IMU, it was established that defendant and the IMU knew many people in common in Uzbekistan.  They also discussed schools and neighborhoods in common.  *Gov't. Ex. 1704.*  Defendant never told the IMU the name of his childhood friend because that is not the reason he contacted the IMU.  He contacted the IMU so it could assist him in conducting a terrorist attack in the United States.

Defendant's third reason for contacting the IMU – to assist U.S. law enforcement efforts – is also false.  Defendant never provided any information to the U.S. government about the IMU even though he regularly communicated with the IMU for ten months.  His explanations to the FBI and jury were, again, in contrast to his communications and actions.  Post-arrest and in trial, defendant fabricated his reasons for contacting the IMU in an effort to conceal his true intent to conduct a terrorist operation in this country.

In sum, defendant's explanations to the FBI and jury for contacting the IMU were false.  He lied to FBI agents at the time of his arrest and lied at trial under oath.  His false statements to agents and his false testimony at trial support application of the obstruction enhancement.

### 2.     Defendant's Story for Purchasing Bomb Components

Defendant's explanations at trial for why he purchased and possessed a hollow hand grenade, Tannerite, AK-47 bullets and various other bomb-making components also were false.

Looking to focus the jury away from his real reasons for possessing these items, defendant provided false, seemingly innocent explanations. For example, he claimed that the bullets and AK-47 magazine were possessed for hunting, yet defendant had not bought a gun to fire the bullets. He claimed he was buying the items in parts – purchasing the magazine first and then at some later time he would purchase the gun. This is analogous to buying gasoline for a car you don't have. Moreover, an AK-47 is not a hunting weapon. In truth, defendant wanted to use the gunpowder from the bullets to build a bomb. Long before defendant took the stand, while in jail awaiting trial, he told his wife during a recorded phone call that he bought the bullets to retrieve the gunpowder because it was a million times better than buying it in a store. *Gov't Ex. 1302*.

His explanation at trial for possession of the grenade also was false. Defendant testified that he intended to mount the grenade to commemorate his approximate one-year of service in the Uzbek military. This testimony was not credible. Defendant testified that he despised the Uzbek government. Indeed, defendant was conspiring with the very organization that was at odds with the Uzbek military. He had no logical reason to want to commemorate his service there. This testimony also was inconsistent with other evidence. No wood to mount the grenade was found near it. Nor was defendant able to explain how he intended to mount the grenade. Defendant purchased the grenade around the same time he bought other bomb-making chemicals and components.

This willful false statement also supports application of the obstruction enhancement.

### 3.    Defendant's Facebook Profile

Defendant also lied to FBI agents when interviewed in May 2013. Defendant's Facebook profile included the words, "Uzbekistan, Tashkent Terorism Terror UIH Karimov Afghanistan Pakistan" beneath his picture. *Gov't Ex. 1226*. After being asked by federal agents the meaning

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 6**

of "UIH," defendant stated that he did not know what "UIH" meant.  *Gov't. Ex. 1002*.  However, at trial, defendant admitted that "UIH" was Uzbek for the "Islamic Movement of Uzbekistan." Defendant testified that he did not lie to the FBI during his post-arrest interview, but stated "it's possible I forgot a little back then."  At trial, evidence revealed that defendant used the term "UIH" in early 2012, more than one year before he was interviewed by the FBI in May 2013. *Gov't Ex. 1465*.  Defendant compounded the lie by telling federal agents in May 2013, that someone else accessed his Facebook account and wrote those words.  *Gov't. Ex. 1002*.  At trial, defendant admitted no one had accessed it and that he was the one who wrote it.  Defendant lied to federal agents in May 2013 about the terrorist organization he supported.  He spoke Uzbek and knew that "UIH" meant Islamic Movement of Uzbekistan.  He was intent on covering up his criminal activity.

In addition, after admitting no one else accessed his Facebook profile, defendant testified that although he used the term "Terorism" [sic] in his Facebook profile, "terrorists don't call themselves that . . . they call themselves mujahideen. . . ."  Evidence at trial established that defendant made a video of himself in Cabela's in Boise, Idaho.  The video depicted handguns, rifles, as well as fighting overseas by terrorists.  *Gov't. Ex. 1265*.  In the video, defendant refers to himself in the credits as a "mujahid."  *Id.*  Mujahid is the singular form of mujahideen.   At trial when pressed on this point during cross-examination, defendant claimed that mujahid to him meant "freedom fighter."  Defendant's explanation was untrue.  Defendant changed his story whenever he believed the truth would expose his criminal intent.  This perjurious testimony also supports application of the obstruction enhancement.

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 7**

4.    Conclusion

Defendant repeatedly lied during his testimony at trial, as well as to federal agents upon his arrest.  He lied about his reasons for contacting a foreign terrorist organization, and his reasons for buying bomb-making components.  Defendant's explanations for contacting the IMU went to the heart of the trial.  The centrally contested issues at trial were: (1) whether defendant contacted the IMU to provide himself as personnel or for some other reason; and (2) whether defendant acquired items like the hand grenade, bullets, fuse and various other components to make a bomb.  Defendant's false testimony was thus material and willful.  He sought to provide innocent explanations that would negate his intent and secure his acquittal.  Thus, the two-level offense enhancement is appropriate.

**B.    TERRORISM ENHANCEMENT**

The PSR applies the terrorism enhancement at U.S.S.G. §3A1.4 to increase defendant's offense level by twelve.  *See* PSR ¶ 161.  Defendant objects for three reasons.  First, he argues that his crimes did not meet the enhancement's "intent" requirement.  Second, he asserts that applying the enhancement results in double-counting.  Third, he argues that a jury, not the court, should have to find the necessary facts for the enhancement to apply.[1]

The court should deny defendant's objections.  Defendant's offenses meet the terrorism enhancement's offense and motivation prongs.  Application of the enhancement is not double counting as the enhancement requires findings beyond what is needed to calculate the defendant's base offense level.  The court may properly find facts necessary to apply the

---

[1] Defendant also argues the terrorism enhancement is too severe a penalty.  This argument is separate from whether the terrorism enhancement legally applies.  The government's sentencing memo addresses defendant's argument that the terrorism enhancement is too harsh.

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 8**

terrorism enhancement under the advisory guidelines system.  The court should therefore deny

defendant's objections to the terrorism enhancement.

        1.    <u>Legal Analysis of the Terrorism Enhancement</u>

Section 3A1.4 of the sentencing guidelines provides

> If the offense is a felony that involved, or was intended to promote,
> a federal crime of terrorism, increase by 12 levels; but if the
> resulting offense level is less than level 32, increase to level 32.

> In each such case, the defendant's criminal history category from
> Chapter Four (Criminal History and Criminal Livelihood) shall be
> Category VI.

Hence, that guideline requires proof of two prongs:  (1) a defendant must have been

convicted of an offense that involved or was intended to promote a federal crime of terrorism

(hereinafter "the offense prong"); and (2) the offense must have been "calculated to influence or

affect the conduct of government by intimidation or coercion, or to retaliate against government

conduct" (hereinafter "the motivation prong").  A "federal crime of terrorism" is defined by

cross-reference to 18 U.S.C. § 2332b(g)(5).  *See* U.S. SENTENCING GUIDELINES MANUAL

§3A1.4 cmt. n.1 (U.S. SENTENCING COMM'N 2015).

To meet the offense prong, defendant must have been convicted of one of the crimes

listed in 18 U.S.C. § 2332b(g)(5)(B).  Title 18 U.S.C. § 2339B, providing material support to

terrorist organizations, is one of the listed offenses.  *See* 18 U.S.C. § 2332b(g)(5)(B).

A conviction under § 2339B is not necessarily, by itself, sufficient for application of the

terrorism enhancement.  *See United States v. Chandia*, 514 F.3d 365, 376 (4th Cir. 2008) and

675 F.3d 329, 334 (4th Cir. 2012).  The government must also satisfy the motivation prong,

which requires the offense must have been calculated to influence or affect the conduct of

government by intimidation or coercion, or to retaliate against government conduct.  That prong

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S**
**OBJECTIONS AND VARIANCE MOTION - 9**

is satisfied if the offense was motivated by politics or the desire to influence the government, even if the defendant's own personal motivations cannot be proven. *See United States v. Awan*, 607 F.3d 306, 318 (2nd Cir. 2010) (vacating and remanding district court decision not to apply terrorism enhancement on grounds that government had not failed to prove requisite motivation); *United States v. El-Mezain*, 664 F.3d 467, 571 (5th Cir. 2011); *United States v. McDavid*, 396 Fed. App'x 365, 372 (9th Cir. 2010) (unpublished). For example, in *Awan*, the Second Circuit found that

> the application of §3A1.4 … does not require a finding that [the defendant] was personally motivated by a desire to influence or affect the conduct of government. Rather, the government need only demonstrate that [the defendant] intended to promote a crime calculated to have such an effect … whatever [the defendant's] reason for committing them.

*Awan*, 607 F.3d at 315-16.

The term "government" in the motivation prong has a meaning broader than the United States government. *See United States v. Thurston*, 2007 WL 1500176 *17 (D. Or. May 21, 2007) (applying motivation prong to conduct directed at state or local government); *United States v. DeAmaris*, 406 F.Supp.2d 748, 750-51 (S.D. Tex. 2005) (finding that "government" in § 2332b(g)(5)(A) includes foreign governments).

2.    Burden of Proof

Courts generally use the preponderance of the evidence standard when finding facts at sentencing. *United States v. Hymas*, 780 F.3d 1285, 1289 (9th Cir. 2015) (citing *United States v. Treadwell*, 593 F.3d 990, 1000 (9th Cir. 2010)). "The higher clear and convincing standard may apply, however, 'when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction.'" *Id.* (quoting *United States v. Mezas de Jesus*,

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 10**

217 F.3d 638, 642 (9th Cir. 2000) (citing *United States v. Restrepo*, 946 F.2d 654, 659 (9th Cir. 1991) (en banc))). "Particularly 'where a severe sentencing enhancement is imposed on the basis of uncharged or acquitted conduct, due process may require clear and convincing evidence of that conduct.'" *Id.* (quoting *Treadwell*, 593 F.3d at 1000).

Where the sentencing enhancements are based on the offense of conviction, the preponderance of the evidence standard has been held sufficient. *United States v. Berger*, 587 F.3d 1038, 1048 (9th Cir. 2009) (citing *United States v. Harrison–Philpot*, 978 F.2d 1520, 1524 (9th Cir. 1992)). There is no bright-line rule for the disproportionate effect test; instead, the court examines the "totality of the circumstances" using six factors first articulated in *United States v. Valensia*, 222 F.3d 1173 (9th Cir. 2000) ("*Valensia* factors"). *Hymas*, 780 F.3d at 1290 (quoting *Berger*, 587 F.3d at 1048 (citing *United States v. Jordan*, 256 F.3d 922, 928 (9th Cir. 2001))).

Under the *Valensia* test, six factors, none of which is dispositive, guide the determination of whether a sentencing factor has a disproportionate impact on the sentence: (1) whether the enhanced sentence falls within the maximum sentence for the crime alleged in the indictment; (2) whether the enhanced sentence negates the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment; (3) whether the facts offered in support of the enhancement create new offenses requiring separate punishment; (4) whether the increase in sentence is based on the extent of a conspiracy; (5) whether an increase in the number of offense levels is less than or equal to four; and (6) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence. *Hymas*, 780

F.3d at 1290.  *See Thurston*, 2007 WL 1500176 *19 (using clear and convincing standard for application of terrorism enhancement).

At sentencing, the government will argue for application of the terrorism enhancement under both standards.  The government respectfully requests the court's ruling on the terrorism enhancement objection address both standards.

        3.      <u>Argument:  The government has proven the enhancement's offense and motivation prongs</u>

Here, there is ample evidence for the court to find that the terrorism enhancement is proper under either standard of proof.  Defendant was convicted of two offenses that qualify under the offense prong.  The trial evidence establishes that his offenses meet the requirements of the motivation prong.  Accordingly, the terrorism enhancement is proper.

Defendant was convicted of conspiracy and attempt to provide material support to a designated foreign terrorist organization, violations of 18 U.S.C. § 2339B.  The statute of conviction is an enumerated offense under § 2332b(g)(5)(B).  Hence, defendant meets the offense prong of the terrorism enhancement.

The trial evidence establishes defendant's offenses meet the motivation prong.  The offenses of conviction involved defendant providing himself, money and software to the IMU, an organization devoted to overthrowing the Uzbekistan government and establishing an Islamic state.  Defendant clearly understood IMU's political agenda.  He viewed numerous IMU propaganda videos, some of which depicted the IMU combatting the United States, NATO and Pakistan militaries.  His Facebook profile also evidenced his understanding of the IMU's goals to overthrow the Uzbekistan government.  *See* PSR ¶ 16.  He agreed to provide anti-virus software to protect the IMU's website, a website devoted to advancing the IMU's agenda to overthrow the Uzbekistan government, establish an Islamic government and combat the western world.  He

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 12**

also agreed to send money for the IMU's movement. *See* PSR ¶¶ 103-104. Defendant created a video entitled, "My Muslim, My Muslim" that showed firearms at the Boise Cabela's store and contained quotes from the IMU's founding member, Tohir Yuldoshev, about taking up arms against infidels. *See* PSR ¶ 135. Therefore, defendant knew he was conspiring and attempting to provide himself, software and money to a group whose sole purpose it was to topple a government.

In his opening communication to the IMU, defendant referred to a video of American soldiers sexually assaulting a Muslim girl as a life changing event. *See* PSR ¶ 17. In the next sentence, defendant asked whether he should conduct a "martyrdom act" in the United States, referencing military installations. *Id.* In his Skype communications with the IMU, defendant referred to Pakistan and Afghanistan as the "inveterate enemies of the US." *See* PSR ¶ 48. He discussed targeting military installations inside the United States. *See* PSR ¶¶ 52-66. In his contacts with the FBI's Salt Lake City source, defendant talked about hatred toward the U.S. military and attacking military installations, including the West Point Military Academy. *See* PSR ¶¶ 93-94. In a March 2013 email, defendant characterized the United States as the "most inveterate enemy of Islam." *See* PSR ¶ 110. He wrote: "Our goal: We want to target the USA, or a revenge of our homeland is still on our shoulders." *Id.* (emphasis added). Hence, defendant was motivated to provide himself, software and money to the IMU to retaliate against the United States for its military actions in the Middle East and Central Asia.

Taken together, defendant's offenses were calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. He joined a terrorist organization dedicated to overthrowing a foreign government. He sought to assist this terrorist organization's goals by providing software and money to them knowing these resources

would help the organization's activities.  Before contacting the IMU, defendant knew that it was involved in combat in Afghanistan and Pakistan against the United States, NATO and the Pakistan government.  To retaliate against the United States government for its actions in Afghanistan and Pakistan, defendant sought to pledge himself to the terrorist organization in order to conduct a bomb attack inside the United States, likely targeting a military installation. To this end, he purchased bomb-making components, researched how to make and use explosives, and sought assistance from the IMU for his contemplated bomb attack within the United States.  His motivations for his crimes were to influence or affect the conduct of government by intimidation or coercion and to retaliate against government conduct.  The motivation prong is met.  The terrorism enhancement properly applies.

4.    Argument:  The enhancement will not result in double counting

Defendant argues that applying the terrorism enhancement results in double counting. Double counting under the guidelines is generally understood to mean that "a provision of the Guidelines is applied to increase punishment on the basis of a consideration that has been accounted for by application of another Guideline provision."  *United States v. Reevey*, 364 F.3d 151, 158 (4th Cir. 2004).  Double counting is permissible unless the guidelines expressly prohibit it in a given circumstance.  *United States v. Reese*, 2 F.3d 870, 894 (9th Cir. 1993).

"The Guidelines seek to punish a defendant for 'all harm that resulted from the acts and omissions' for which he is responsible."  *Reese*, 2 F.3d at 894-95 (citing U.S. SENTENCING GUIDELINES MANUAL § 1B1.3(a)(3)).  "When more than one kind of harm is attributable to a given aspect of a defendant's conduct, failure to enhance his punishment for each harm caused thereby would defeat the Commission's goal of proportionality in sentencing."  *Id.* at 895.

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 14**

"Thus, there is nothing wrong with 'double counting' when it is necessary to make the defendant's sentence reflect the full extent of the wrongfulness of his conduct." *Id.*

Impermissible double counting "occurs where one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by the application of another part of the Guidelines." *Id.* "In practical terms, this means that impermissible double counting is to be found where one Guidelines provision 'is akin to a 'lesser included offense' of another,' yet both are applied." *Id.*

Courts in terrorism cases have rejected defendant's double counting argument. In *United States v. Meskini*, 319 F.3d 88, 92 (2nd Cir. 2003), the defendant argued that the terrorism enhancement constituted double counting because the government used the same criminal act to increase both his offense level and criminal history category. The Second Circuit rejected this argument, explaining that congress and the sentencing commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation. *Id.; see also United States v. Hammoud*, 381 F.3d 316, 356 (4th Cir. 2004) (affirming application of the terrorism enhancement).

Here, defendant contradicts his own double counting argument. On one hand, he argues that the terrorism enhancement should not apply because the jury never found the added motivation prong. He thus acknowledges that the enhancement requires evidence on factors beyond the elements of the crimes of conviction and offense guideline. *See* DEF. VARIANCE MOT. 2-4. On the other hand, he argues that, despite this added requirement, the terrorism enhancement constitutes double counting. *See* DEF. SENT. MEM. 6. He cannot have it both

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 15**

ways.  If the terrorism enhancement requires proof of conduct beyond the elements of the crime and base offense guideline (which it does), then defendant's double counting argument fails.

Further, following the analysis in *Reese*, applying the terrorism enhancement does not result in double counting.  First, the guidelines do not expressly prohibit application of the terrorism enhancement.  Second, the terrorism enhancement requires two additional findings: the offense and motivation prongs.  It is possible to be sentenced under §2M5.3, the guideline provision used to calculate defendant's base offense level, without having engaged in conduct that would satisfy the terrorism enhancement's offense or motivation prongs.  Defendant recognizes as much when he argues that the enhancement does not apply because the jury did not find the additional motivation prong.

For these reasons, application of the terrorism enhancement is not double counting.

5.    Argument:  The court may find the facts supporting the enhancement

The court, not a jury, may make the necessary factual findings for the terrorism enhancement to apply without violating the Sixth Amendment.  Defendant's objection on this ground should be denied.

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court rendered the guidelines advisory to remedy any constitutional violation that occurred when federal courts engaged in fact-finding that resulted in an increase in a defendant's "maximum sentence" under the guidelines.  Hence, the Sixth Amendment is implicated only if the guideline range exceeds the statutory maximum sentence for a particular offense.  *See Thurston*, 2007 WL 1500176 *17-18 (rejecting defendant's *Booker* challenge to the terrorism enhancement's automatic criminal history category increase).  The Seventh Circuit rejected a similar argument where a defendant was convicted of obstruction but acquitted of the terrorism charge.  *United States v. Ashqar*, 582

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 16**

F.3d 819 (7th Cir. 2009).  There, the defendant argued that applying the terrorism enhancement violated his Sixth Amendment right to a jury trial because (1) the court relied on conduct for which the jury acquitted him, and (2) the enhancement increased his potential sentencing range beyond the maximum that would have applied (or that would have been reasonable) based solely on the facts found by the jury.  The Seventh Circuit held instead that "[i]mposing a higher sentence based on judicially-found facts does not violate the Sixth Amendment because 'the judge could disregard the Guidelines and apply the same sentence … in the absence of the special facts . . . .'"  *Ashqar*, 582 F.3d at 825 (quoting *Rita v. United States*, 551 U.S. 338, 368–85 (2007) (Scalia, J., concurring)).

Here, defendant offers no explanation for why the government should have to prove facts, used to enhance his advisory guidelines range, to a jury.   Rather, the district court may make such findings.  Indeed, since the *Booker* decision in 2005, the Ninth Circuit has affirmed district courts' application of the terrorism enhancement through judicial fact finding in a number of cases.  *See United States v. McDavid*, 396 Fed. App'x 365 (9th Cir. 2010) (unpublished); *United States v. Cottrell*, 312 Fed. App'x 979 (9th Cir. 2009) (unpublished); *United States v. Schipke*, 291 Fed. App'x 107 (9th Cir. 2008) (unpublished); *United States v. Tankersley*, 537 F.3d 1100 (9th Cir. 2008); *United States v. Tubbs*, 290 Fed. App'x 66 (9th Cir. 2008) (unpublished).

In the absence of any contrary legal authority, the court should deny defendant's objection on this point.  The court may make the necessary factual findings to apply the terrorism enhancement.

Accordingly, for all these reasons, the terrorism enhancement properly applies in this case.  The court should deny defendant's objections to the enhancement.

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 17**

### C.      DOUBLE JEOPARDY AT SENTENCING

On the issue of imposing multiple sentences for conspiracy and attempt crimes, the Ninth Circuit's analysis differs from other circuits. *See United States v. Crowder*, 588 F.3d 929, 939 (7th Cir. 2009) (rejecting Ninth Circuit "single course of action" test and adopting Supreme Court's *Blockburger* test).

The Ninth Circuit has recognized that conspiracy and attempt crimes involve different elements and, in that respect, are not the same the crime. *United States v. Arbelaez*, 812 F.2d 530, 534 (9th Cir. 1987) (however, for purposes of sentencing the court agreed with defendant's argument that consecutive sentences on drug trafficking conspiracy and attempt convictions was precluded because they were the same crimes); *United States v. Baltimana*, 623 F.2d 1366, 1370 (9th Cir. 1980). *See also United States v. Chandia*, 514 F.3d 365, 372 (4th Cir. 2008) (holding that multiple punishments may be imposed for a conspiracy and substantive violation of 18 U.S.C. § 2339B).

However, the Ninth Circuit has held that singular acts should not result in multiple sentences, especially in drug cases. *United States v. Palafox*, 764 F.2d 558, 562 (9th Cir. 1985) (en banc); *United States v. Fernandez-Angulo*, 863 F.2d 1449, 1454 (9th Cir. 1988) (surveying Ninth Circuit cases on merger issue); *United States v. Touw*, 769 F.2d 571, 574 (9th Cir. 1985) (vacating dual sentences because defendants engaged in single act when attempting to buy marijuana). This includes mere successive steps in one criminal undertaking. *See United States v. Wilson*, 781 F.2d 1438, 1440 (9th Cir. 1986). "The singularity of an act is to be gauged by reference to time, place, and persons involved . . . ." *Id. See also United States v. Sanchez-Vargas*, 878 F.2d 1163 (9th Cir. 1989) (applying analysis to alien smuggling statutes). Where a conspiracy existed, followed by a number of separate transactions and events involving different

people at various locations over a period of months, a court may impose multiple sentences for conspiracy and attempt charges. *United States v. McQuisten*, 795 F.2d 858, 868 (9th Cir. 1986).

Here, similar to *McQuisten*, defendant's crimes involved a number of different transactions and events, involving different people and locations over a period of about ten months. Within the overarching conspiracy, defendant and his co-conspirator agreed on multiple crimes – a bomb attack in the United States, the provision of anti-virus software and the provision of money. Each agreement had a different origin – defendant proposing the bomb attack and his co-conspirator requesting software and money months after the original conspiracy had formed. Further, each agreement evolved over a period of months. These separate sub-agreements, although between the same two conspirators, are separate acts.

Even if the court considers only the provision of personnel under count one, this case did not involve a singular act similar to the drug cases cited above. The evidence presented at trial established that defendant sought to provide not only himself as personnel, but that he also advised the IMU that his wife was ready to participate. Defendant also sought to recruit the Salt Lake City source during the many hours he spent showing the source videos and discussing how to make explosives. These actions occurred over a period of many months, involving different times, places and persons, and are in no way similar to the facts of either *Palafox* or *Touw*, cited above. Defendant's actions did not constitute a singular act.

Furthermore, the Ninth Circuit's singular act analysis should be limited and should not apply in the context of a terrorism case charging violations of 18 U.S.C. § 2339B. Conspiring and attempting to provide material support to designated foreign terrorist organizations involve a special kind of danger. *See United States v. Humanitarian Law Project*, 561 U.S. 1 (2011) ("Everyone agrees that the Government's interest in combating terrorism is an urgent objective

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 19**

of the highest order.")  In enacting § 2339B, congress made the following specific finding: "[F]oreign organizations that engage in terrorist activity are so tainted by their criminal conduct that *any contribution to such an organization* facilitates that conduct."  *See* AEDPA Section 301(a)(7), 110 Stat. 1247, note following 18 U.S.C. § 2339B (Findings and Purpose).  Thus, there is no reason to think that congress intended, in the terrorism context, to deviate from the general principal that conspiracy and attempt are separately punishable, even if they were to involve a single transaction.

For these reasons, under existing Ninth Circuit authority, the court may impose multiple sentences for the conspiracy and attempt convictions.  Accordingly, the defendant's statutory maximum sentence is properly capped at 40 years (480 months).

If the court disagrees with this analysis because it finds the conspiracy and attempt convictions are really a single course of conduct, then the government acknowledges that *Palafox* and its progeny currently apply in the Ninth Circuit and this court is bound by it.  In that event, the conspiracy and attempt convictions would merge for sentencing and defendant's statutory maximum sentence would be capped at 25 years (300 months).

The government does not agree with Ninth Circuit precedent on this issue.  Rather, the government believes that  the *Blockburger* test also should apply in this context, in accord with the Seventh Circuit's reasoning in *Crowder, supra*.  Thus, the government raises this issue to preserve it for appeal.

Under *Blockburger*, a court must determine "whether each provision requires proof of a fact which the other does not."  *Crowder*, 588 F.2d at 939 (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).  If each offense requires proof of a fact which the other does not, then a court may impose separate sentences, even where those crimes arise out of a single criminal

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 20**

act. *Id.* "The *Blockburger* test is easily administered and does not lend itself to a fact-specific inquiry that inevitably will lead to unnecessary appeals and leave parties and courts 'without hope of much guidance.'" *Id.* (quoting *United States v. Saviano*, 843 F.2d 1280, 1293 (10th Cir. 1988)). And, the court retains discretion to address situations where sentencing on both counts may affect an excessive or otherwise inappropriate sentence. *Crowder*, 588 F.2d at 939. The Sixth, Seventh, Eighth and Tenth Circuits apply the *Blockburger* test at the sentencing phase. *Id.*

If it were not bound by *Palafox* and were to apply the *Blockburger* test here, the court could impose multiple sentences on the conspiracy and attempt convictions even if it did determine that the defendant's conduct involved a single course of action. Because conspiracy requires an agreement with another person, and attempt may be completed alone, the crimes are separate offenses. *See Arbelaez*, 812 F.2d at 534. Therefore, defendant's maximum sentence would be 480 months imprisonment.

## III.    SENTENCING MEMORANDUM AND RESPONSE TO VARIANCE MOTION

### A.    LEGAL ANALYSIS

The Ninth Circuit has set forth a basic framework that district courts should follow to comply with the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005):

1. Courts are to begin all sentencing proceedings by correctly determining the applicable sentencing guidelines range, precisely as they would have before *Booker*.

2. Courts should then consider the § 3553(a) factors to decide if they support the sentence suggested by the parties. Courts may not presume that the guidelines range is reasonable. Nor should the guidelines factors be given more or less weight than any other. They are simply to be treated as one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence.

3. If a court decides that a sentence outside the guidelines is warranted, then it must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 21**

    4.  Courts must explain the selected sentence sufficiently to permit meaningful appellate review.

*United States v. Carty*, 520 F.3d 984, 991-92 (9th Cir. 2008).

## B.    SENTENCING CALCULATION

    1.  <u>Statutory Maximum and Minimum Sentence</u>

Defendant was found guilty of counts one, three and four of the superseding indictment. Counts one and four carry a statutory maximum term of imprisonment of 15 years each. Count three carries a statutory maximum term of imprisonment of 10 years. PSR ¶ 189. Hence, the statutory maximum sentence is 40 years (480 months) in prison. *Id.*

    2.  <u>United States Sentencing Guidelines Calculation (USSG)</u>

"As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

    a.  Offense Level Calculation

The defendant's offense level is properly calculated as follows:

§ 2M5.3(a) : Base Offense Level           26

§ 2M5.3(b)(1)(A) & (C): Material Support for Violent Act[2]  +2

§ 3C1.1: Obstruction of Justice           +2

<u>§ 3A1.4: Adjustment for Terrorism           +12</u>

---

[2] The PSR cites to U.S.S.G. § 2M5.3(b)(1) stating that the offense involved the provision of subsections (A) dangerous weapons and (C) explosives and thus a 2 level increase is appropriate. Subsection (E) involves the provision of funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act. Although defendant was convicted of possession of an unregistered destructive device, the evidence presented at trial established that the material support or resources he conspired and attempted to provide was personnel (himself) with the intent that he would carry out a terrorist act in the United States on behalf of the IMU. Thus, the government believes subsection (E) applies and properly increases the offense level by 2 points.

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 22**

Total Offense Level                                    = 42

PSR ¶¶ 154-165.

      b.  Criminal History Calculation

The offense involved a federal crime of terrorism.  Thus, the proper criminal history

category is VI.  *See* U.S. SENTENCING GUIDELINES MANUAL § 3A1.4(b) & PSR ¶ 170.

      c.  Advisory Guideline Range

The PSR properly calculates the advisory guideline range at 360 to 480 months.[3]  PSR ¶

190.  This sentence is based upon a total offense level of 42 and a criminal history category of

VI.  In addition, U.S.S.G. § 5G1.2(d) provides that on multiple counts of conviction, where the

sentence imposed on the count carrying the highest statutory maximum is less than the total

punishment, the sentence imposed on the other counts shall run consecutively, but only to the

extent necessary to produce a combined sentence equal to total punishment.  *Id*.  The government

concurs with the PSR's final guideline range of 360 to 480 months.

### C.    IMPOSITION OF SENTENCE UNDER 18 U.S.C. § 3553

In fashioning a sentence, the court "shall impose a sentence sufficient, but not greater

than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]," that being the

need for the sentence to (1) reflect the seriousness of the offense, (2) promote respect for the law,

(3) provide just punishment for the offense, (4) afford adequate deterrence to criminal conduct,

(5) protect the public from further crimes of the defendant, and (6) provide the defendant with

needed educational or vocational training, medical care, or other correctional treatment in the

most effective manner.

---

[3] The PSR actually calculates defendant's guidelines range at 360 months to life.  The maximum
guidelines range, however, is capped at 480 months by virtue of the statutory maximum
sentences for the offenses of conviction.

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S
OBJECTIONS AND VARIANCE MOTION - 23**

Here, the nature and circumstances of the offense, and the history and characteristics of defendant, support a sentence of imprisonment of 420 months. Such a sentence is sufficient, but not greater than necessary, to comply with the purposes in § 3553(a)(2).

    1.  <u>The Nature and Circumstances of the Offense</u>

Defendant was an operational terrorist who was committed to killing Americans in the United States. Defendant spent countless hours on his computers and cellular telephones researching chemicals and components necessary to construct a destructive device. He purchased the items and stored them in his one-bedroom apartment in Boise, Idaho. Defendant used social media, specifically Facebook and YouTube, to show his support for the IMU, a designated foreign terrorist organization, and to incite others to support the IMU as well. Defendant intentionally downloaded jihadist and martyrdom videos from the IMU's official website, furqon.com, and sent them to his brother overseas. For over 10 months spanning 2012 and 2013, defendant was engaged in continuous online contact with IMU operators overseas discussing detonating a bomb in the land of the "infidels" - the United States - and providing monetary and computer software support to the group. His commitment to attack Americans on a military base or at a crowded Fourth of July parade in downtown Boise, Idaho, was unwavering. As his IMU co-conspirator wrote to the defendant in December 2012, **"[s]hould there be a strike, it should be such a strike that generations after them will remember. And that is not possible without a thorough preparation.**" *Gov't. Ex. 1704* (emphasis added). A generational strike became his mission.

    a. Defendant's Hatred of the United States

Despite defendant's self-serving claims otherwise during his testimony, his words and actions displayed a hatred for the United States that drove his desire to commit an act of

terrorism.  Indeed, when discussing the terrorist attacks of September 11, 2001, defendant stated

in a recorded conversation with a government confidential human source:

> That was great then! To be honest, I am happy when something bad happens to
> Americans… What's that called . . . What's that . . . Any matter, any . . . for example,
> even a rape takes place on the streets, I am happy if it's any American.[4]

Defendant again expressed his feelings about the United States in written communications with

the IMU in July 2012, referring to the citizens of the United States as "infidels."  *Gov't. Ex.*

*1230*.  On February 12, 2013, in the same vein, defendant wrote to the IMU expressing his hatred

for America and his plan for an attack in the United States:

> I have to get in from another place, because it looks like these infidels are pretty scared.
> They put a lot of people to follow us too, but they won't be able to catch us, God willing.

> God willing, everything will be all right.  The victory is near.

*Gov't. Ex. 1704*.  In subsequent e-mail communications with the unknown user of muhammad-

faruq@mail.ru in March 2013, defendant wrote in part:

> Right now I live inside the most inveterate enemy of Islam – the USA.  I am standing
> ready in accordance with a verse, which says, "Fight infidels who are within your reach .
> . . . Our goal: We want to target the USA, or a revenge of our homeland is still on our
> shoulders.

*Gov't. Ex. 1334*.  This was not a man who loved America.  This was a man who hated America

and expressed that hatred in communications he believed were private.  These communications –

made when he believed no one was watching – are the true measure of his feelings toward the

United States and its citizens.

---

[4] A portion of this call was admitted as *Gov't. Ex. 1322*.  The government redacted and did not
seek admission for defendant's statement referring to the rape of Americans, although it was
provided to defense counsel in un-redacted form.  The full transcript is attached as *Gov't. Ex. A*.

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S**
**OBJECTIONS AND VARIANCE MOTION - 25**

b. Defendant's Radicalization

Defendant's radicalization was becoming evident in as early as January 2012.  He posted

his support on his YouTube channel for the IMU:

> "[B]rothers should know that soon we, the American Muslims, will also be joining the
> brothers in tribal areas, Islamabad and Afghanistan, God willing, and I.M.U. [Islamic
> Movement of Uzbekistan].  We send our greetings to you.  We pray for you all."

*Gov't. Ex. 1465*.   In another post to YouTube in May 2012, defendant asked for others to pray

for Muslim "Martyrs":

> It is mentioned in the Quran that the real Muslims will face difficulties on the path of
> Allah and also it is mentioned that there are Martyrs on that path.  Those people are not
> traitors, they didn't commit any crime.  Keep praying for them.  I appeal to you to be a
> real Muslim.

*Gov't. Ex. 1469*.  Defendant's obsession with "martyrs" was abundantly clear from files retrieved

from his computers.  The videos saved on his computers involved combat footage of terrorist

groups overseas, truck bombings, suicide missions and in some cases beheadings, dead children

and burned human remains.[5]  *Testimony of Evan Kohlmann and Gov't. Exs. 1721-1722, 1724,*

*1726-1732, 1738-1741, 1743, 1744, 1746, 1748-1750*.  At trial, the government called terrorism

expert Evan Kohlmann who testified that he had never reviewed computer hard drives with more

IMU materials than what he located on defendant's computers.  Testimony at trial established

that defendant sent many of these jihadist videos to his brother overseas.  *Testimony of John*

*Lawrence*.  One particular series of videos located on defendant's computers was named "Jihad

in Afghanistan."  This series depicted IMU personnel firing weapons at U.S. helicopters and U.S.

convoys, with remnants of U.S. military equipment destroyed on the ground in Afghanistan.

*Testimony of Evan Kohlmann*.  The graphic videos saved to defendant's computers were

---

[5] During trial, the government did not elicit testimony or admit into evidence videos saved to
defendant's computers of beheadings, dead children or burned human remains.

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S
OBJECTIONS AND VARIANCE MOTION - 26**

voluminous and clearly show that defendant was not just curious about fireworks. Rather, he was consumed by an extremist ideology. He downloaded and viewed videos about death and destruction whenever possible. Simply put, no one downloads and watches these types of videos, and this many, unless they are firmly committed to the cause.

Moreover, these videos plainly had an effect on his psyche. In a July 2012 communication with the IMU, defendant claimed to have been influenced after watching Abdulaziz, Teacher Abdulmalik, and Ali "the sniper." *Gov't. Ex. 1230.* Testimony at trial established that these were IMU operatives who had martyred themselves. The videos depicted the operatives preparing for and accomplishing their suicide missions. *Testimony of Dr. Guido Steinberg and Evan Kohlmann.* Defendant wrote to the IMU in September 2012, again referencing the two IMU martyrs fondly stating, "[I] myself got interested after watching big brother Abdul Malik and Ali." *Gov't. Ex. 1704.*

Further, defendant identified himself with the cause of terrorism. Defendant's Facebook profile, posted to his page in July 2012 displayed his photograph and the caption:

UZBEKISTAN, TASHKENT TERORISM TERROR UIH KARIMOV AFGHANISTAN PAKISTAN

Testimony at trial established that "UIH" is the Uzbek abbreviation for "IMU" or Islamic Movement of Uzbekistan. *Gov't. Ex. 1226.* Defendant, having become radicalized, was ready to pick his targets.

Most disturbing is the magnitude of defendant's radicalization. Rather than provide funding or tangible resources to the IMU, defendant chose the most lethal form of support: killing. Prior to his opening communication with the IMU, sent on July 31, 2012, defendant had researched how to make a bomb and had purchased bomb-making components and chemicals.

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 27**

Defendant's heavy viewing of IMU propaganda videos were not the source for his desire to conduct a bomb attack. His own expert testified at trial that, historically, violence has predated videos, and that videos are not a major contributing factor to violence.

Thus, defendant's violent intent was of his own making. He chose a violent purpose to his radicalization long before communicating with the IMU. His lethal purpose never wavered in the subsequent months that he talked with the IMU. Since his conviction at trial, defendant's violent nature has re-emerged in jail. The court's takeaway should be this: defendant was neither "brainwashed" nor misled into a violent form of radicalization. Rather, it was the path that he, on his own, chose. This conduct was among the most serious therefore warranting a substantial sentence and well above the 15 years defendant's counsel seeks.

### c. Defendant Targeted the Military and Fourth of July Parade

The evidence showed that defendant intended to target the military or innocent Boise civilians with his bomb attack. As he sat alone in his Boise apartment in the summer of 2012, defendant conducted approximately 27 specific searches for military facilities, which led him to approximately 44 internet sites on the United States military. Defendant's searches included "United States Military Academy," "West Point Military Academy," and "U.S. Military." *Testimony of John Lawrence*. Defendant also searched for "texas marine military academy," "New York Navy," and "how many student in west point military academy" among others. Plainly, he was targeting a United States military base for a bomb attack, not to enlist, as he incredibly testified at trial. A mere fifteen days prior to those searches, defendant wrote to the IMU requesting guidance on committing a martyrdom act, specifically identifying the United States military as a target:

> And as I wrote in my previous email about the same subject, this is what I want to ask you again: Should I emigrate in the cause of faith or, since we are the CLOSEST ONES

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 28**

> TO INFIDELS over here and, God willing, we have almost everything, what would you say, if, with the help of God, we implement a martyrdom act (actions)? **There are military installations right here**, targets, and vehicles are available as well.

*Gov't. Ex. 1230* (emphasis added).  This was consistent with defendant's communications with the IMU in December 2012, when he referred to the "navy," "TX" and "Ny" while discussing military locations in the United States.  *Gov't. Ex. 1704*.  Defendant's intent to target a United States military base was further established while he was alone with the Salt Lake City source in January 2013.  Defendant described being followed by law enforcement as he conducted surveillance on a military facility in Idaho:

> A military base.  Because in our Idaho – I want to just go to watch the military base in Idaho.  This time just one car followed me.  After-after, when I went to base, the seven car follow me.  I was –the military base—it's really next to Boise, Idaho.

*Gov't. Ex. 1109.*

He wanted to kill as many servicemen as possible.  He told the source that if you put a bomb in a car on a military base, more people will die:

> Because see, if you—which means that—if you put the car on the base, and if you want to stay—not die, but to stay, you can like kill-kill more people.  But if you want to go to this time, you can go-go and-and go to more inside and make something—some shooting or something else, and then finish, and then the bomb.

> [T]hat's why uh, when you go to set up, you chose more people.

> That's what the Americans are scared about.

*Gov't. Ex. 1111.*  Describing in detail the best place for a bomb attack, defendant told the source

> [F]or me the best, best place or best—no one, but two places, because one of the –a military base—any military, any.  Even-event the student bases.  Because, in New York we have a one-one big base.  They call—point-Point View.

> Oh, no, sorry.  Viewpoint.  But this is a big military school. . . .

*Gov't. Ex. 1111*.  Defendant researched the number of military students at West Point Academy five months prior to his conversation with the source.  Indeed, he sought to perpetrate the attack during graduation ceremonies to achieve the most casualties.  *Id.*

Alternatively, defendant wanted to target innocent civilians.  Again, seeking mass casualties, defendant contemplated attacking the Fourth of July parade in Boise, Idaho.  He recounted for the source how families bring their children to see the fireworks at Ann Morrison Park, revealing his disregard for all lives, young and old.  In addition to innocent civilians, defendant hoped to kill military families attending the parade.  Defendant told the source that "military takes his family.  Because the military number one enemy of Muslim. . . ."  *Gov't. Ex. 1108*.  Defendant's specific references to targets for attack, and his clear desire to maximize harm, demonstrate that he was committed to an attack against Americans.  They demonstrate the seriousness of his offense and the need for a substantial sentence of 420 months.

### d.  Defendant Researched How to Make a Bomb

His targets coming into focus, defendant researched how to make a bomb.  In his post-arrest interview with the FBI on May 16, 2013, he was asked if he researched how to build a bomb.  He responded, "Yes, I did study it.  Yes.  On YouTube."  *Gov't. Ex. 1010*.  Truth be told, he spent hours on his computers searching for ways to make a bomb.  He searched online for, "how to make a C4 bomb," "ammonium bomb," and "zeomax zeolite turf aid bomb" – which is made from fertilizer.  *Testimony of John Lawrence*.  These are high-intensity explosives and are completely inconsistent with firework-grade explosives.

In addition to learning how to build a bomb, defendant searched for the component chemicals.  Defendant's searches for chemicals included, tannerite, cold packs, ANFO[6], acetone,

---

[6] ANFO is ammonium nitrate fuel oil.

black powder, sulfuric acid, hydrogen peroxide, aluminum powder, ammonium nitrate, and

fertilizer.  *Id.*  These chemicals are more consistent with building a bomb than a firework.  None

of these searches included "how to make fireworks."

Further, defendant spent considerable time on YouTube, watching videos on bomb

making and researching components necessary to construct a device.  Testimony and evidence

from trial revealed that defendant's YouTube account included "favorites" and "likes" for bomb

components and videos depicting buildings and vehicles being blown up.  Defendant's "list of

likes and favorites" – made it easy for him to find videos quickly.  Some of the videos included:

> Detonator C4 bomb part I
>
> How to make aluminum powder from household materials
>
> How to make an electric Igniter
>
> How to Make Ammonium Nitrate
>
> Massive Truck Explosion
>
> ANFO VN
>
> Phone detonator tips
>
> Homemade Wireless Detonator

*Gov't. Exs. 1470, 1484.*

Defendant wanted to build a bomb that would kill as many people as possible.  He

viewed an internet site related to "metal shavings" in July 2012.  *Testimony of John Lawrence.*

Testimony at trial established that defendant also asked his former co-worker for metal shavings

from a device used to fabricate air conditioning apparatus.  The co-worker testified that he didn't

give defendant any shavings because he was concerned about defendant's purpose in asking for

the shavings.  Defendant's purpose in acquiring metal shavings was clear --- he wanted to use

them as shrapnel in an explosive device.  There is no use for metal shavings in fireworks.  In

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S
OBJECTIONS AND VARIANCE MOTION - 31**

fact, when defendant was alone with the source he described why it is necessary to include

shrapnel in a bomb:

> Yes. For town, or police station, or capital building, or central, like capital street with a lot of people. Because this is things why we put inside lot of metal, lot of like stuff, like who is can cut or kill people like, or … or metal stuff, because this is has a pressure, and pressure . . .

*Gov't. Ex. 1107*. He also took the source to retail stores and identified chemicals and

components used in making a bomb, including a jar of metal BB's. He explained to the source

that BB's could increase the number of people killed when used as shrapnel in a bomb.

*Testimony of Abdul Mohammed, Gov't. Exs. 1074, 1574, 1082*.

Having researched on his own, defendant also sought assistance from the IMU on making

a bomb. In September 2012, defendant wrote:

> We are learning this business, but you are more experienced. That's why you teach us the basics. God willing, it is close. Or even if it's a bit later, we will perform the transaction. God willing, it will be very beneficial.

*Gov't. Ex. 1704*. Thereafter, on October 3, 2012, defendant asked for specific instructions on

building the device. He wrote:

> We continue with our preparations. I wrote to you asking for your advice.
>
> We get anything we want all the time. It is cheap, but I don't know how to make it and how to put it all together.
>
> But we need to know how to connect the wires, how much and what to do. Also, it would be great if we learn how to operate the remotely controlled ones. While some are operated remotely, others will be by ourselves. We don't have many people, but it will be great, God willing.

*Id*. After the IMU replied to defendant that same day and agreed to consult with an instructor,

defendant replied:

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 32**

> Oh, may Allah be pleased, it would be great!  That's what I've been waiting for.  Because we made a couple ourselves and it didn't work.  It came out very crude.  It's not going to work.  You have to come up next to it to light it up, that's why.

*Id.*  Again, defendant words and actions show that whether he was writing to the IMU, talking with the source, or sitting alone in his apartment, his intent was the same.  He wanted to make a bomb that would kill as many innocent people as possible.  Based on these facts, a substantial sentence of 420 months is warranted.

e.  Defendant's Substantial Steps to Build a Bomb

Not only did defendant research bomb-making and seek assistance from the IMU to construct one, defendant went a step further and began constructing a device.  Defendant purchased charcoal, ammunition, acetone, calcium nitrate, ammonium sulfate, aluminum powder, tannerite, a dummy hand grenade, sulfur powder, and potassium nitrate, among other components.  *Gov't. Ex. 1720*.  Two separate searches of defendant's residence revealed many of these chemicals, as well as additional components such as drain cleaner, fertilizer and cut-open cold packs containing ammonium nitrate.  *Gov't. Exs. 1184, 1165*.

Defendant spent hours explaining the impact of various chemicals and components with the CHS, and on January 17, 2013, provided the CHS with written instructions to construct a triacetonetriperoxide (TATP) bomb.  *Gov't. Ex. 1788*.  Defendant even told his wife in a recorded  jail call after his arrest, that he purchased the ammunition to retrieve the gun powder because he believed it was "[a] million times better than the gun powder sold in stores." *Gov't. Ex. 1302*.  These were not components used to make a firework.  Defendant could have purchased fireworks online or at various firework stands in Idaho.  He wasn't interested in fireworks -- he wanted to make something bigger, something that would kill.

During defendant's 10-month long conspiracy with the IMU, they candidly discussed what was necessary for a successful terrorist act in the United States.  Defendant explained that he had gathered materials, but that he continued to gather more.  On September 8, 2012, he wrote:

> But I continue gathering the materials . . . . God willing, things are moving ahead, but I didn't have time to write to you.

*Gov't. Ex. 1704*.  On September 18, 2012, defendant continued his quest for bomb-making materials, telling the IMU:

> My family and I are ready.  We need to get a little more of posessions [sic].  The different prominent places of the cities became targets.  God willing, everything will be fine. Please pray and advise.

> God willing, it is close.  Or even if it's a bit later, we will perform the transaction.  God willing, it will be very beneficial.

*Id.*  Similarly, on October 3, 2012, defendant sent numerous messages to the IMU letting the IMU know that he remained committed to gathering bomb-making components.  He even attempted to send the IMU pictures of U-Haul vehicles that he had rented.  *Gov't. Exs. 1289, 1290*.  These were vehicles that could be used for a car bomb.  He wrote:

> We continue with our preparations.

> There are plenty of these kind of vehicles we have available here, but we have a lot of our personal vehicles too.

> In just a regular store, you know, both the ammonium nitrate and sulphate are available. Gunpowder is available as well.  There are AK, M16, bullets, everything.  But we need to know how to connect the wires, how much and what to do.  Also, it would be great if we learn how to operate the remotely controlled ones.  While some are operated remotely, others will be by ourselves.

*Id.*

Defendant took substantial steps to build a bomb that he could detonate in the United States.  He gathered materials, experimented with various chemicals, and spent considerable time

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 34**

planning his assault.  This was not a man that wanted to make fireworks.  This was a man committed to killing innocent Americans.

> f.  Support for Terrorism against the U.S. and Allies Overseas

Not only was defendant intent on detonating a bomb in this country, but he also agreed to help the IMU with money and software for their computers.  Defendant understood that money was necessary to fund the IMU's activities abroad.  Money buys guns, bombs, artillery and vehicles that the IMU used to fights its enemies, including U.S. forces in Afghanistan. *Testimony of Evan Kohlmann*.  Money helps members of the IMU travel to fight.  And money helps the IMU operate its website and recruit new members.  Defendant further understood that anti-virus software is important to secure the IMU's computers.  Secure computers prevent infiltration by intelligence agencies that could foil future attacks or operations.  The IMU requested anti-virus software to protect its website.  Defendant was familiar with that website, furqon.com, which included martyrdom videos and other extremist materials.  Defendant agreed to obtain the anti-virus software for the IMU and further sought to obtain copies from his brother overseas.  *Gov't. Exs. 1704, 1324, 1326*.

So, in addition to providing himself, defendant agreed to provide money and anti-virus software.  To this end, defendant agreed to open a company for the IMU, which he incorporated in Idaho in May 2013.  *Gov't. Ex. 1381*.  He and the IMU discussed how much money to send, where to send it, and with whom it would be sent.  Many of the communications include coded references to countries for delivery.  *Gov't. Ex. 1704*.  These communications continued until defendant's arrest in May 2013.

When asked by the IMU to provide money, defendant stated, "[i]t is possible.  Be patient a bit.  First, I will try to send a little, because these ones monitor even the senders."  *Id.*  When

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 35**

asked by the IMU to assist in the acquisition of computer software to secure the IMU's website, defendant responded, "No problem.  We'll take care of that now, God willing."  *Id.*  Whatever the terrorist organization needed – defendant wanted to provide.

g.  Conclusion

The nature and circumstances of defendant's conduct were egregious. Defendant's communications as well as his actions demonstrated his commitment to extremist principles, his support for a designated foreign terrorist organization, and his desire to engage in a violent act directed at Americans on American soil in furtherance of those extremist principles.

These facts show that the defendant's conduct was serious with the potential for significant harm and loss of life had his conduct not been discovered.  Further, defendant's conduct demonstrated disregard for the law and human life.  The court should impose a serious sentence of 420 months.

2.    The History and Characteristics of Defendant

The history and characteristics of defendant also support a 420 month sentence.  Not only was defendant focused on killing innocent Americans, his conduct also put his family at risk. Defendant was charged with serious substantive terrorism offenses and he included his wife in his activities, notwithstanding that they have a young child together.  Defendant instructed his wife to transport many of the chemicals and components he purchased to construct a bomb, from the one-bedroom apartment they shared, to the apartment they subsequently lived with his parents, sister and son.  Similarly, unbeknownst to them, defendant's parents and sister lived in a two-bedroom apartment where bomb-making chemicals and components were stored.  These actions demonstrate complete disregard for the potential harm to defendant's family members.

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 36**

Additionally, in a recorded jail call between defendant and his wife, defendant instructed his wife that she should let certain Uzbeks know the identity of a certain government source that was disclosed to him during a meeting with counsel in July 2014.  Defendant told her, "In short, you have to let them know what [CHS] has been up to, you know what I mean?"  During the same conversation he told her, "So, anyway this has to come out, you know."  Far from shielding his wife from criminal activity, he included her in his activities, with peril to his son.  These actions also could have potentially placed the government source in danger.

Defendant's conduct after conviction further reveals his true character.  On October 6, 2015, while incarcerated at the Ada County Jail, defendant, after being told he would not be receiving a laptop computer for use, became violent with the officers in the jail.  Defendant yelled obscenities at the officers, and ignored officer orders.  As an officer approached defendant to restrain him, defendant threw a book at him.  Defendant continued to yell obscenities at the officers and resisted being handcuffed.  During the altercation, defendant assaulted the responding officer by spitting in his face and stomping on his foot.  Defendant continued to resist the officers' efforts by refusing to walk, and attempting to kick the officers while they subdued him.  Once in a holding cell, defendant repeatedly kicked the door of the cell and spit into the closed-circuit camera.[7]

In another instance, on October 19, 2015, defendant used his shower shoe tied to the end of a towel to direct swings at the camera located in his cell.  After four failed attempts, his fifth attempt was successful.  Defendant hit the camera and the fire sprinkler head in his cell, causing the sprinkler head to break resulting in alarms and water to be emitted.  Thereafter, in November 2015, defendant was ordered to cease throwing food and trash under his door.  Defendant's

---

[7] The video is approximately 35 minutes long.  During that time, defendant spits into the camera at least 18 times and kicks and/or punches the door for most of the video.

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 37**

behavior has been an ongoing issue, and despite repeated warnings and orders by the jail staff to curb that behavior, defendant continues to abuse his food by throwing it into the hallway.

Defendant has no regard for anyone but himself.  He assaulted jail staff and continues to be disrespectful by failing to follow orders.  Moreover, defendant carelessly involved his wife and family in his criminal activities and attempted to cause harm to a government source by exposing his identity.

       3.    <u>Deterrence to Criminal Conduct</u>

The United States faces significant threat from terrorist acts planned or committed by homegrown violent extremists who, like defendant, become radicalized online and seek to engage in violent acts to support terrorist organizations overseas.  A substantial sentence here can provide deterrence to others from engaging in this type of conduct.  Defendant was caught before he could act through vigilant law enforcement efforts.  In fashioning a sentence, the court should account for general deterrence by making an example of defendant.  The court can send a message to others who may be contemplating an attack on U.S. soil that their efforts will be severely punished.

## IV.    CONCLUSION

The government's within-guidelines recommendation is based in part on the fact that such a sentence properly reflects the accumulated wisdom and expertise of the sentencing commission, and serves the vital goal of uniformity and fairness in sentencing.  Therefore, "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."  *Gall*, 552 U.S. at 50 n.6.

The guidelines deserve significant respect.  The government recognizes that the guidelines are entirely advisory, and that a district court has discretion to vary from an advisory

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 38**

range, subject only to deferential appellate review for reasonableness.  A district court, however, must consider the guidelines range, *see* § 3553(a)(4), and is usually well-advised to follow the sentencing commission's advice in order to assure fair, proportionate, and uniform sentencing of criminal offenders.  Moreover, there are no other 3553(a) factors in this case that mitigate against imposition of a sentence within that range; to the contrary, the 3553(a) factors on balance support the imposition of the recommended guidelines sentence.  Accordingly, the government recommends a sentence of 420 months.

Respectfully submitted this 4th day of January, 2016.


WENDY J. OLSON
UNITED STATES ATTORNEY
By:


/s/_____
AARON N. LUCOFF
Assistant United States Attorney

/s/_____
HEATHER S. PATRICCO
Assistant United States Attorney

/s/_____
LAWRENCE SCHNEIDER
U.S. Department of Justice Trial Attorney
Counterterrorism Section


**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND VARIANCE MOTION - 39**

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 4, 2016, the foregoing **GOVERNMENT'S**

**SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S OBJECTIONS AND**

**VARIANCE MOTION** was electronically filed with the Clerk of the Court using the CM/ECF

system, and that a copy was served on the following parties or counsel by:

| | |
|---|---|
| CHARLES F. PETERSON, JR.<br>COURTNEY PETERSON<br>913 W. River St., Ste. 420<br>Boise, Idaho 83702<br>chuck@petersonlawyers.com<br>Courtney@petersonlawyers.com | ☐ United States Mail, postage prepaid<br>☐ fax<br>☒ ECF filing<br>☐ email |

/s/ _____
Aaron Lucoff

**GOVERNMENT'S SENTENCING MEMORANDUM, RESPONSE TO DEFENDANT'S
OBJECTIONS AND VARIANCE MOTION - 40**